ROBERT S. HUDSPETH, PROSECUTOR-PLAINTIFF IN ERROR, v. FRANCIS J. SWAYZE ET AL., DEFENDANTS-DEFENDANTS IN ERROR.

Argued November 3, 1913—Decided January 23, 1914.

1. The supplement to the Jury act approved May 29th, 1913 (*Pamph. L., p.* 828), in which it was provided that the grand and petit juries of the several counties should be drawn by commissioners, one the sheriff and the other a citizen of the county appointed by the Chancellor, who should not be a member of the same political party as the sheriff, which act, by its terms, was to become operative· on the fourth Tuesday of November, 1913, provided that those voting for its adoption in a state-wide referendum at the election for members of the general assembly in that year, should be a majority of all those voting on the question of the adoption or rejection of the act, was not a delegation of legislative power to be exercised directly by the people. It was a perfect piece of legislation in and of itself and the provision that it should remain inoperative until the legal voters of the state adopted it was simply the contingency or condition upon which the statute should go into effect. Statutes may be made to take effect upon the happening of contingencies. There is no express prohibition in the constitution which prevents the legislature from prescribing such a contingency as that in the act under review. In the absence of an express limitation upon the legislature's power in this regard one will not be imported into the constitution by implication. There is no necessity for such an implication, and in the absence of express prohibition, only a necessary implication will limit power.

2. If the foregoing view be not demonstrably the correct view it is at least a permissible view, and where there are two permissible views as to the existence of a constitutional limitation—one unfavorable and the other favorable—to a given statute, the courts must accord to the legislature the right to hold that view of the constitution which supports its enactment, even should the other view seem to the court to be the preferable one.

3. The act under consideration is not unconstitutional because it limits the power of the Chancellor in the selection of jury commissioners to the appointment of citizens who are not members of the same political party as the respective sheriffs.

4. The act of May 29th, 1913 (*Pamph. L., p.* 828), called the Chancellor-Sheriff Jury act, is constitutional.

On error to the Supreme Court.

For the plaintiff in error, *Robert S. Hudspeth,* prosecutor of the pleas, and *Edmund Wilson,* attorney-general.

For the defendants in error, *Joseph M. Noonan.*

The opinion of the court was delivered by

WALKER, CHANCELLOR. The act concerning juries (*Comp. Stat., p.* 2964) requires the sheriff of the several and respective counties to draw and summon grand and petit juries.

By supplement of May 27th, 1913 (*Pamph. L., p.* 803), the Jury act was amended and provision made that the sheriff of each county should make lists of persons liable to jury duty—a grand and petit jury list—from which the Supreme Court justice assigned to hold the Circuit Court in the county might strike off the names of any persons; that on a day and time to be fixed by such justice, the sheriff, or his deputy, should attend in open court and draw the grand and petit juries in the manner indicated. This is called the Fielder act. In obedience to the provisions of this statute, Mr. Justice Swayze, holding the Hudson Circuit, made an order that the sheriff of Hudson, or his deputy, should attend in open court, on November 26th, 1913, for the purpose of drawing grand and petit jurors for the ensuing December term.

Another supplement to the Jury act was approved two days later, and on May 29th, 1913 (*Pamph. L., p.* 828), in which it was provided that the grand and petit juries of the several counties should be drawn by commissioners, one the sheriff and the other a citizen appointed by the Chancellor, who should not be a member of the same political party as the sheriff, which act, by its terms, was to become effective on the fourth Tuesday of November, 1913, provided that those voting for its adoption at the election for members of the general assembly in 1913 should be a majority of all those voting on the question of the adoption or rejection of the act. This is called the Chancellor-Sheriff act. The section providing for the referendum reads as follows:

"14. All acts and parts of acts inconsistent with this act are hereby repealed, and this act shall take effect immediately,

but its provisions, except as to the referendum herein contained shall remain inoperative as a law of this state until the legal voters of the state voting at the next general election held after the approval of this act for the election of members of the general assembly have adopted the provisions of this act in the manner hereinafter provided. The county clerk in every county shall cause public notice of the submission of the question of the adoption of this act in the said general election to be given by advertisement signed by himself and set up in at least fifty different places in his county and published in one or more newspapers thereof for at least fifteen days before such election. The ballots used at the said election shall contain the words 'for the adoption of an act approved (insert here the date of approval), and entitled "A supplement to an act entitled 'An act concerning juries' " (Revision), approved March twenty-seventh, one thousand eight hundred and seventy-four.'

"Below upon said ballot shall appear the phrase 'I favor the adoption of said act,' and the phrase 'I oppose the adoption of said act,' with a square to the left of each phrase, and below shall appear the words 'Place a cross in one square.'

"The votes cast upon the question of the adoption of this act shall be canvassed in the manner now provided by law for the canvass of votes cast at the general election held for the election of the members of the general assembly; and if the greater number of votes cast with reference to the adoption or rejection of this act favor the adoption of this act, the act shall become effective as a law of this state on the fourth Tuesday of November, one thousand nine hundred and thirteen; but if the greater number favor the rejection of this act, then this act shall be null and of no effect."

The election for members of the general assembly took place on November 4th, 1913, and the majority of the voters voting on the referendum of the Chancellor-Sheriff Jury Commission act, voted in favor of its adoption, as appears from the canvass made in pursuance of the act. It, therefore, if valid, went into operation on the fourth Tuesday of November, 1913, which was the 25th day of that month—one day earlier

than the day set for the drawing of jurors by Mr. Justice
Swayze at the court house in Jersey City under the Fielder
act. The Chancellor-Sheriff act contained a repealer of all
acts and parts of acts inconsistent with its provisions. If
valid, it superseded the supplement to the Jury act approved
May 27th, 1913, known as the Fielder act.

Mr. Justice Swayze, upon making the order for the drawing
of jurors under the Fielder act, on motion of Prosecutor Hud-
speth, of Hudson, immediately allowed a writ of *certiorari* to
the Supreme Court certifying into that tribunal his order
made under the Fielder act. As a single justice sitting for
the Supreme Court, he heard argument on the *certiorari* and
rendered judgment that the Chancellor-Sheriff act was in all
respects null and void and of no effect.

At the time of rendering judgment, Mr. Justice Swayze
delivered an opinion in which he held the Chancellor-Sheriff
act to be void because it was an abdication of the power to
legislate which the people had entrusted to the houses of the
senate and assembly in and by the constitution of 1844. In
other words, because the legislature had not the power by
referendum to delegate to the people the function of saying
whether or not a certain act passed by the legislature should
become operative and effective, the Chancellor-Sheriff act was
unconstitutional. The question thus propounded to the Su-
preme Court, and decided by it, is novel in this state, although
we have several decisions which trench upon the subject.

In the outset of the discussion it is pertinent to remark
that express power in the legislature to submit a statute to the
people at large for adoption or rejection is not conferred by
the constitution except in the one instance hereinafter men-
tioned, and here, too, it is to be observed that such a power is
not expressly withheld from the legislature.

Our constitution provides (article 4, section 1, paragraph
1) : "The legislative power shall be vested in a senate and
general assembly." It is true the constitution also provides
(article 3, paragraph 1) : "The powers of the government
shall be divided into three distinct departments—the legisla-
tive, executive and judicial;" and, while it further provides

in the same article and section that "no person or persons belonging to, or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided," this bestowal of powers, and their devolution upon the respective departments, does not make any limitation upon the powers of the legislature.

Mr. Justice Dixon, speaking for this court in *Ross* v. *Freeholders of Essex*, 40 *Vroom* 291 (at *p.* 293), said that the clause dividing the powers of the government into three departments was *distributive*, and that the clause that no person belonging to or constituting one department should exercise any of the powers properly belonging to either of the others was a *prohibitive* clause. Concerning the scope of this prohibitive clause, Mr. Justice Dixon further said (at *p.* 294) :

"Here it should be noted that the force of this clause is, not to confine the legislature to powers which are legislative, the governor to powers which are executive, and the courts to powers which are judicial, but merely to forbid each department to encroach upon the powers properly belonging to another. The powers properly belonging to each of these departments and, therefore, forbidden to the others, are those assigned under the general terms, legislative power, executive power, and judicial power, and also those specifically delegated by the constitution to the senate and general assembly, or to the governor, or to the courts."

In the conclusion reached by this court in *Attorney-General* v. *McGuinness*, 49 *Vroom* 346, upon views formulated by Chancellor Pitney and stated by Mr. Justice Garrison, in the opinion (at *p.* 357), it is said:

"Our present constitution is therefore not to be construed as if it were adopted in view of any established and uniform system of local self-government.

"As already observed, that instrument may be searched in vain for any provision guaranteeing that privilege to the people.

"The course of legislation under the constitution of 1844, and the character of the amendments that were adopted by

the people after thirty years of such legislation, demonstrate, as we think, that the power of the general legislature over local municipal establishments is not hampered by any limitation guaranteeing local self-government."

These decisions (Ross *v.* Freeholders of Essex and Attorney-General *v.* McGuinness) clearly indicate a view by this court that the powers of the legislature are not narrow and limited but broad and comprehensive.

True it is that the constitution contains certain express limitations upon the powers of the legislature, but among them is no prohibition against submitting to popular vote questions whether or not an act passed by the legislature shall become operative.

Admittedly the Chancellor-Sheriff act is made to take effect upon a future day and upon the happening of a contingency. This in and of itself is unobjectionable. Pertinent cases in this state are: *Paterson* v. *The Society,* 4 *Zab.* 385; *Paul* v. *Gloucester,* 21 *Vroom* 585; *Attorney-General* v. *McGuinness,* 49 *Id.* 346; *In re Cleveland,* 22 *Id.* 319; *S. C. on error,* 23 *Id.* 188.

As already remarked the exact question presented for solution in this case is one of novel impression in this state, and, while the trend of judicial authority in other states has been against the right asserted by the legislature in this state in the act under review, there are cases holding such an act to be constitutional. One of them is *State* v. *Parker,* 26 *Vt.* 357. In that case the question of the time at which a prohibitive liquor law should go into effect was made to depend upon the vote of the people at a state-wide referendum, and Chief Justice Redfield, delivering the opinion of the Supreme Court of that state, which was unanimous, among other things, said:

"In this state, the constitution vests the legislative power in the general assembly, consisting of the house of representatives and the senate; and if the mode of proceeding under consideration is equivalent to giving legislative power to the people at large, it is, no doubt, in conflict with the constitution. But it is not very obvious, to us, why this should be so

regarded, unless it is done as matter of argument, and to
justify a foregone conclusion, which is not one of the legiti-
mate elements of a judicial determination, more than it is of
a legislative act, that it shall have the sanction of the people.

*    *    *    *    *    *    *    *    *    *

"And, in regard to the statute of 1852, it cannot, with any
show of fairness, be said the legislature did not enact the
law, and fully pass upon all questions of constitutionality or
expediency involved in the subject.    And it is admitted on
all hands that the legislature may enact laws, the operation
or suspension of which shall be made to depend upon a con-
tingency.    This could not be questioned, with any show of
reason or sound logic.    It has been practiced in all free states
for hundreds of years, and no one has been lynx-eyed enough
to discover, or certainly bold enough to declare, that such
legislation was, on that account, void or irregular.    And it
is, in my judgment, a singular fact, that this remarkable dis-
covery should first be made in the free representative democ-
racies of America; and in regard to taking the sense of these
same people, upon the expediency of legislation, where the
legislators are confessedly the mere agents and instruments
of the people, to express their sovereign and superior will, to
save the necessity of assembling the people in mass; and
when, from the very nature of the case, the representative is
in honor and good faith, bound to conform his action to the
will and desire of his constituents.

"Does any one seriously doubt the perfect propriety of the
legislature, upon questions of general policy, affecting equally
the whole state, acting upon the known will of the state,
where that is known?    We suppose not.    And if the sessions
of the legislature were long enough, this might be ascertained
during the session—as it is to a considerable extent, some-
times—by petitions, and legislation made to conform to such
informally expressed will.    But if the sessions are too short,
and a more formal expression of the will of the people is
desired, it amounts to the same thing practically, to provide
that the law shall not come into full operation until the
people have had an opportunity to say whether they are pre-

pared to conform to the required change. And in regard to these great moral, social and economical reforms, can it be doubted that the question of the preparation of the public mind to sustain them, firmly and quietly, lies at the very foundation of all hopeful legislation on the subject? And is this not precisely what American legislatures both state and national have always, in effect, although not in form, been accustomed to do?  *  *  *  Numerous other instances may be found where statutes have been made dependent upon future contingencies, not only for the time of their coming in force, but for their very vitality ; and no question of their validity has ever been made upon that ground. This is all recognized as sound law and established precedent by those courts and by those judges who have attempted to argue that a law, made dependent upon a popular vote, was different in principle from one dependent upon other contingencies. But all such attempts seem to me altogether illusory, and, to some extent, captious, not to say frivolous.

"If the operation of a law may fairly be made to depend upon a future contingency, then, in my apprehension, it makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and legal one, not opposed to sound policy, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one. And to use the contingency upon which the present statute was to be suspended, until another legislature should meet and have an opportunity of reconsidering it, was not only proper and legal, and just and moral, but highly commendable and creditable to the legislature who passed the statute; for, at the very threshold of inquiry into the expediency of such a law, lies the other and more important inquiry, are the people prepared for such a law? Can it be successfully enforced? These questions being answered in the affirmative, he must be a bold man who would even vote against the law; and something more must he be who would, after it had been passed with that assurance, be willing to embarrass its operation or rejoice at its defeat.

"After a full examination of the arguments by which it is attempted to be maintained, that statutes made dependent upon such contingencies are not valid laws, and a good deal of study and reflection, I must declare, that I am fully convinced—although at first, without much examination, somewhat inclined to the same opinion, that the opinion is the result of false analogies, and so founded upon a latent fallacy. It seems to me that the distinction attempted between the contingency of a popular vote and other future uncertainties, is without all just foundation in sound policy or sound reasoning, and that it has too often been made more from necessity than choice—rather to escape from an overwhelming analogy, than from any obvious difference in principle in the two classes of cases."

That eminent jurist, Chief Justice Cooley of Michigan, in his work on *Const. Lim.* (*7th ed.*) (at *p.* 168), says:

"If it is not constitutional to delegate to a single locality the power to decide whether it will be governed by a particular charter, must it not quite as clearly be within the power of the legislature to refer to the people at large, from whom all power is derived, the decision upon any proposed statute affecting the whole state? And can that be called a delegation, of power which consists only in the agent or trustee referring back to the principal the final decision in a case where the principal is the party concerned, and where perhaps there are questions of policy and propriety involved which no authority can decide so satisfactorily and so conclusively as the principal to whom they are referred?"

In the matter of the *Opinions of the Justices to the House of Representatives,* 160 *Mass.* 586, it was held by three as against two, that an act granting to women the right to vote in town and city elections which was to take effect throughout the commonwealth only upon its acceptance by a majority vote of the voters of the whole state was unconstitutional. One of the justices who did not concur was Mr. Justice Holmes, now of the Supreme Court of the United States, who, in an able dissenting opinion made the following observations:

"I admit that the constitution establishes a representative government, not a pure democracy. It establishes a general court (the legislature) which is to be the law-making power. But the question is whether it puts a limit upon the power of that body to make laws. In my opinion the legislature has the whole law-making power except so far as the words of the constitution expressly or impliedly withhold it, and I think that in construing the constitution we should remember that it is a frame of government for men of opposite opinions and for the future, and therefore not hastily import into it our own views, or unexpressed limitations derived merely from the practice of the past. I ask myself, as the only question, what words express or imply that a power to pass a law subject to rejection by the people is withheld? I find none which do so. The question is not whether the people of their own motion could pass a law without any act of the legislature. That no doubt, whether valid or not, would be outside the constitution. So perhaps might be a statute purporting to confer the power of making laws upon them. But the question, put in a form to raise the fewest technical objections, is whether an act of the legislature is made unconstitutional by a proviso that, if rejected by the people, it shall not go into effect. If it does go into effect, it does so by the express enactment of the representative body. I see no evidence in the instrument that this question ever occurred to the framers of the constitution. It is but a short step further to say that the constitution does not forbid such a law. I agree that the discretion of the legislature is intended to be exercised. I agree that confidence is put in it as an agent. But I think that so much confidence is put in it that it is allowed to exercise its discretion by taking the opinion of its principal if it thinks that course to be wise. It has been asked whether the legislature could pass an act subject to the approval of a single man. I am not clear that it could not. The objection, if sound, would seem to have equal force against all forms of local option. But I will consider the question when it arises. The difference is plain between that case and one where the approval required is that

of the sovereign body. The contrary view seems to me an echo of Hobbes's theory that the surrender of sovereignty by the people was final. I notice that the case from which most of the reasoning against the power of the legislature has been taken by later decisions states that theory in language which almost is borrowed from the Leviathan. *Rice* v. *Foster,* 4 *Harr.* (*Del.*) 479, 488. Hobbes urged his notion in the interest of the absolute power of King Charles I., and one of the objects of the constitution of Massachusetts was to deny it. * * * I may add, that, while the tendency of judicial decision seems to be in the other direction, such able judges as Chief Justices Parker of Massachusetts, Dixon of Wisconsin, Redfield of Vermont, and Cooley of Michigan, have expressed opinions like mine."

In *Smith* v. *City of Janesville,* 26 *Wis.* 291, an act of the legislature affecting the people of the whole state was held not to be invalid because it was to take effect only after it should be approved by a majority of the popular vote at a certain election. Chief Justice Dixon said (at *p.* 294) :

"But it is said that the act is void, or at least so much of it as pertains to the taxation of shares of national banks, because it was submitted to a vote of the people, or provided that it should take effect only after approval by a majority of the electors voting on the subject at the next general election. This was no more than providing that the act should take effect on the happening of a certain future contingency, that contingency being a popular vote in its favor. No one doubts the general power of the legislature to make such regulations and conditions as it pleases with regard to the taking effect or operation of laws. They may be absolute, or conditional and contingent; and if the latter, they may take effect on the happening of any event which is future and uncertain. Instances of this kind of legislation are not unfrequent. The law of congress suspending the writ of *habeas corpus* during the late rebellion is one; and several others are referred to in the case *In re Richard Oliver,* 17 *Wis.* 703. It being conceded that the legislature possesses this general power, the only question here would seem to be, whether a

vote of the people in favor of a law is to be excluded from the number of those future contingent events upon which it may be provided that it shall take effect. A similar question was before this court in a late case (*State, ex. rel. Attorney-General, v. O'Neill, Mayor, &c., 24 Wis.* 149), and was very elaborately discussed. We came unanimously to the conclusion in that case, that a provision for a vote of the electors of the city of Milwaukee in favor of an act of the legislature, before it should take effect, was a lawful contingency, and that the act was valid. That was a law affecting the people of Milwaukee particularly, while this was one affecting the people of the whole state. There the law was submitted to the voters of that city, and here it was submitted to those of the state at large. What is the difference between the two cases? It is manifest, on principle, that there cannot be any. The whole reasoning of that case goes to show that this act must be valid; and so it has been held in the best considered cases, as will be seen by reference to that opinion. We are constrained to hold, therefore, that this act is and was in all respects valid from the time it took effect, in November, 1866; and consequently that there was no want of authority for the levy and collection of the taxes in question."

*People v. Collins, 3 Mich.* 343, was a case in which the justices of the Supreme Court of Michigan were equally divided upon the question as to whether or not an act prohibiting the manufacture and sale of intoxicating liquors was constitutionally in force because submitted to the people at a state-wide referendum for their approval or disapproval as to the time when it should go into effect. Green, P. J., in the course of his opinion said (at *p.* 360) :

"It was suggested upon the argument that section 2 of article 15 of the constitution forbids, by implication, the submission of any other laws than such as are mentioned therein, to a vote of the electors. That section is as follows: 'No banking law, or law for banking purposes, or amendments thereof, shall have effect until the same shall, after its passage, be submitted to a vote of the electors of the state at a general election, and be approved by a majority of the votes cast

thereon at such election.' This language does not warrant any such construction; on the contrary, if any implication is to be drawn from it, it is that the legislature possesses the power in all cases, to be exercised or not in their discretion, and that in the cases specified it should be their imperative duty to make the submission. It is not the form of language by which a power is conferred, but that in which a limitation or restriction is imposed."

We have a similar provision in our constitution, and, by parity of reasoning, it is an implication to the effect that the legislature in all cases *may* submit statutes to the people and take their sense as to whether or not they shall take effect and become operative. The clause in question is to be found in article 4, section 6, paragraph 4, and concerns the limitation as to the amount for which state debts may be created, and provides, among other things:

"And no such law shall take effect until it shall, at a general election, have been submitted to the people, and have received the sanction of a majority of all the votes cast for and against it at such election."

The constitutions which Chief Justices Redfield, Cooley and Dixon and President Judge Green and Mr. Justice Holmes, respectively, commented upon, contain provisions with reference to the general powers of the legislature similar to those found in our own constitution, and neither of them expressly confer upon, nor expressly withhold from, the legislature, the power to submit statutes to the people at a state-wide referendum election on the question of their taking effect and becoming operative.

Mr. Justice Swayze, in his opinion in the Supreme Court, starts with the assertion that it is an important consideration that the counties of this state have equal representation in the senate, and he says:

"If an act can be adopted by a majority of the votes cast for it regardless of whether it is a majority of the whole electorate or not, or even if it can be adopted by a referendum approved by a majority of all the voters in the state, it is obvious that the representation of the smaller counties does not

have the same effect as it would have if the act of legislation were carried out by the means pointed out by the constitution, for the voters of Hudson and Essex county could outvote the voters of eleven counties in this state that might be named. That is an important consideration when you come to consider the right of the legislature to make the existence of a law dependent upon a referendum, for that is what they have done in this case. They have not said, as they say in the case of local option statutes and municipal charters and acts of incorporation, that this law shall be a law now, that it shall take effect immediately, and make its operation dependent upon its acceptance by the incorporators or by the municipality, or by the county, as in Paul *v.* Gloucester County."

The answer to the objection that the voters of a few populous counties could override the voters of a majority of the other counties, by reason of the latter containing smaller voting populations, lies in the fact that before any act of the legislature can be submitted to a state-wide referendum a majority of the county constituents through their representatives in the senate say whether or not the act shall be submitted, and the less populous counties, being in a great majority, can prevent, by negative votes in the senate, any act being submitted which would be inimical to their particular interests.

The learned justice's observation that he cannot understand how an act may not be operative for more than six months after its adoption—"hung between heaven and earth," as he puts it—seems to be without weight. If the act in question contained no referendum and simply provided that it should go into effect six months after its passage, it certainly could not be condemned on that ground. The legislature can select whatever time in future it may choose to make its enactments take effect. If laws passed by the legislature can be made to take effect immediately, or within a short period afterward, as is frequently the case, certainly they can be made to take effect a considerable time after their passage, if the legislature so wills. Many statutes are passed in January to take effect on the 4th day of July next ensuing.

The decision below is principally grounded upon the opinion

of Chief Justice Green in the Supreme Court in *Paterson* v. *Society*, 4 *Zab.* 385, in which these principles are laid down (at *p.* 395) :

"It is conceded as indisputable—

"1. That as well by the fundamental theory of representative democracy as by the express provision of the constitutions of the states of the union, legislation cannot be exercised directly by the people.

"2. That the legislative power cannot be delegated; that it can be exercised only by the functionaries and in the mode designated and prescribed in the constitution.

"3. That a law enacted by any other authority, or in any other mode than that prescribed by the constitution, is void."

Chief Justice Green did not decide in Paterson *v.* Society that a state-wide referendum of a legislative enactment was unconstitutional, for the reason that that question was not submitted in that case. He did, however, clearly express that view, and his expression therefore is to be considered as *obiter dictum*. The Chief Justice says: "Legislation cannot be exercised directly by the people." That may well mean that the people at large cannot enact or repeal a statute. He also says: "The legislative power cannot be delegated." That must mean that the power to originate and pass laws cannot be delegated to the people. He further says: "A law enacted by any other authority or in any other mode than that prescribed by the constitution is void." That, of course, means that the people could not assemble *en masse* or call a state convention and through either instrumentality enact a statute which would have the force of law.

It seems clear that what the legislature did in this case was not to make a delegation of legislative power to be exercised directly by the people so as to bring it under the ban of Chief Justice Green's proscription. The act was a perfect piece of legislation in and of itself. The question was not sent to the voters to initiate or formulate any law upon the subject. Their will was simply made the contingency or condition upon which the statute should or should not become operative. They did not "legislate" upon the subject.

A reason for holding the act under consideration to be constitutional, notwithstanding a state-wide referendum, as we read and understand it, is to be found in the language of Mr. Justice Van Syckel, speaking for this court in *Paul* v. *Gloucester County, supra* (at *p.* 593), where he says:

"In approaching this subject, it is pertinent to remark that there is no express provision in our constitution that legislative power shall not be delegated.

"The assumed incapacity to delegate is implied, as a necessary result, from the fact that, in our system of government, the power to make the laws is lodged in our senate and general assembly; that a consequent obligation rests upon them to exercise the function with which they are entrusted; and that in the absence of express authority to delegate, such authority does not exist.

"The only restraints upon the exercise of the legislative prerogative are those expressly or impliedly contained in the federal and state constitutions, and those immutable principles which lie at the very foundation of society.

"When we recur to the fact that the power of eminent domain has been delegated to railroad and other corporations without challenge; that the important power of taxation and all the powers of local government have, for more than three generations, been delegated in our state, we are admonished not to be too confident in asserting where the precise limitation is upon the competency of the legislature to delegate powers of government.

"We must be careful, therefore, how, in the absence of express injunction or clear implication, we strip a co-ordinate branch of the state government of the right to give expression to its will, in the form of law, within its own department.

"At a very early day the federal court upheld a law which was framed to take effect upon a contingency as to the conduct of foreign governments. I refer to the 'non-intercourse' law, which, in effect, provided, that in case Great Britain or France should revoke or modify its edicts previously issued, so that they should cease to violate the neutral

commerce of the United States, the trade suspended by law should be renewed. *The Aurora* v. *United States, 7 Cranch* 382."

The cases in this state support, as constitutional, a referendum to the voters of towns upon the theory of submitting charter and police regulations to the corporators for acceptance or rejection, and we find Paul *v.* Gloucester to be the first case in which a referendum to the counties, as political subdivisions of the state, for the adoption or rejection of a legislative grant of police power was upheld. It is but another step to hold that in the absence of any constitutional limitation the legislature may refer to the people in whom "all political power is inherent" (*Const., art* 1, ¶ 2), on a state-wide referendum vote, to say whether or not a certain act of the legislature shall become operative and effective.

That statutes may be made to take effect upon the happening of contingencies is established. The legislature has made the approval by the people of the Chancellor-Sheriff Jury act the contingency upon which that act was to take effect. We find nothing in the constitution which amounts to a limitation of the legislature's right to do what they have done; and certainly there is no express prohibition against it in that instrument. In the absence of an express limitation upon the legislature's power in this regard one ought not to be imported into the constitution by implication. There is no necessity for such implication, and in the absence of express prohibition, only a *necessary* implication will limit power.

Whether the provision in the referendum section that if the greater number of voters voting at the election favor the rejection of the act would amount to a delegation of legislative power because, in effect, it would give to the people the right to practically repeal an act of the legislature, it is not necessary to consider and decide, because the contingency, upon which the act might have been annulled, did not arise, and, besides, that part of the provision could be excised from the act under the rule that where one part of a statute is

unconstitutional because it is not within the scope of legislative power to pass it, another part of the same act may not be obnoxious for the same objection, but may be enforced as if made in a different statute. *Morris* v. *Carter,* 17 *Vroom* 260, 267.

The alternate provision that the act should be void if the vote were adverse is clearly separable from the other parts of the act, and, if void, would not destroy it. Valid and void enactments may be contained in the same section. An unconstitutional provision in a statute does not affect the validity of another provision in the same act, unless the two provisions . are so intimately united that the presumption arises that the legislature would not have adopted one without the other. *State* v. *Kelsey,* 15 *Vroom* 1, 29.

For the foregoing reasons we are of opinion that the act in question is valid and constitutional. But there is a second ground upon which the act is to be upheld.

It was said by Mr. Justice Garrison in *Attorney-General* v. *McGuinness, supra* (at *p.* 373) :

"The ultimate judicial question is not whether the court construes the constitution as permitting the act, but whether the constitution permits the court to disregard the act; a question that is not to be conclusively tested by the court's judgment as to the constitutionality of the act, but by its conclusion as to what judgment was permissible to that department of the government to which the constitution has committed the duty of making such judgment.

"A court by force of its own reasoning, or by reason of the diversity of sentiment among its own members, may often conclude that, while according to what it deems the correct view, an act is void, still there is another view that is permissible that would support the act. As legislators the judges would be bound to follow their own judgment, but as a court they must accord that same right to those in whom the constitution has reposed it."

The legislature must be presumed to have considered this phase of the question, that is, whether the submission of the adoption of their act to a state-wide referendum was pro-

hibited by the constitution or any decision of the courts of this state, and, while the trend of authority upon the broad question of the power of the legislature to make such a submission to the people as was done in this case, is against the exercise of that right, still, the question being an open one with us, we think this act must be upheld because there are two views of the question, one favorable and one unfavorable, and while, as stated, the weight of authority elsewhere is unfavorable, nevertheless, the favorable view is supported by such eminent authority, that, in our judgment under *Attorney-General* v. *McGuinness, supra,* we must accord to the legislature the right to form its own judgment as to the constitutionality of the provision of the act in question, and we support the judgment so formed. In fine, where there are two permissible views as to the existence of a constitutional limitation—one unfavorable and the other favorable—to a given statute, the courts must accord to the legislature the right to hold that view of the constitution which supports its enactment, even should the other view seem to the court to be the preferable one. The mere fact that dissentient views to a generally accepted doctrine are held, or have been expressed, does not conclude the question that there are two permissible views within the meaning of this rule. The existence of such dissenting views is merely a reason, which, together with other relevant considerations, are to be taken into account by the court in the determination of the question whether there are two permissible views. In the present case, upon such consideration, we have determined that there are two permissible views within the meaning of the rule stated. This same question was before us in *Attorney-General* v. *McKelvey,* 49 *Vroom* 621, and Mr. Justice Swayze, who wrote the opinion for this court, says (at *p.* 622) :

"The fundamental principle which is controlling upon the courts in passing upon the constitutionality of a statute has been nowhere better stated than by Mr. Justice Garrison. *Ante, p.* 346. After reviewing the authorities, he says (at *p.* 371) : 'These citations, which might be indefinitely extended, show the existence of a well-defined though self-

imposed limitation of the judicial function of declaring legis-
lative acts to be void for unconstitutionality, which limita-
tion is for practical purposes stated to be that an act will
not be declared void by the courts if its unconstitutionality is
in anywise doubtful.' He adds that the notion that a legis-
lative act will be sustained only when it is demonstrably
constitutional 'in effect supplements the constitution by
requiring the affirmative concurrence of all three depart-
ments of the government, where that instrument of the
organic law requires but two, viz., the legislative and the
executive, and thus, in effect, annexes to the judicial branch
a *quasi*-legislative function akin to that which the constitu-
tion itself has annexed to the executive by the veto power.'

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"In applying these fundamental principles to a particular
case, it is important, not only to read the language of the
constitution, which is necessarily our guide, but to read that
language in view of the established meaning that it has ac-
quired."

Nor do we regard the act under consideration as uncon-
stitutional because it limits the power of the Chancellor in
the selection of jury commissioners to the appointment in a
given county, of a citizen, resident therein, who shall not be
a member of the same political party as the sheriff. A
similar question was decided by this court in *Attorney-Gen-
eral* v. *McKelvey, supra.* The act there involved was one
creating boards of public works in certain cities and pro-
vided that no more than two members of any board could be
of the same political party. The act was upheld as to that
particular feature upon the reasoning of the Chief Justice in
the same case in the court below. See *McCarter* v. *McKel-
vey,* 49 *Vroom* 3 (at *p.* 6).

The other questions urged upon our attention we deem to
be without weight.

The judgment under review must be reversed.

GARRISON, J. (concurring). The question is whether the
constitution of this state sets a limitation upon the legisla-

tive power that was overstepped in the enactment of the statute before us.

As to the existence of such a constitutional limitation there are two opposing views, one that relied upon by the court below in declaring the statute to be unconstitutional, the other that relied upon by this court in sustaining the constitutionality of the statute; views that are set forth at length in the opinions of these courts respectively.

That either of these views is a permissible one is thus practically tested and demonstrated, and that such is the case is expressly decided by this court.

Such demonstration and decision render it unnecessary to determine which of these two views is the preferable one in the opinion of this court, since regardless of such determination the act of the legislature under review cannot be declared to be unconstitutional if such act can be sustained upon a view of the constitution that it was permissible for the legislature to take, and that such a view exists is both decided and demonstrated in the opinion of Chancellor Walker speaking for this court.

This is the rule announced for this court in *Attorney-General* v. *McGuinness,* 49 *Vroom* 346, and followed and reaffirmed by this court in *Attorney-General* v. *McKelvey,* 49 *Id.* 621.

Upon this ground, which is the one last stated in the Chancellor's opinion, I base my vote for the reversal of the judgment rendered by the Supreme Court.

*For affirmance*—THE CHIEF JUSTICE, PARKER, VREDENBURGH, JJ.    3.

*For reversal*—THE CHANCELLOR, GARRISON, TRENCHARD, BERGEN, MINTURN, KALISCH, BOGERT, CONGDON, WHITE, HEPPENHEIMER, JJ.    10.