Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ismael Herrero, Jr. Y Otros<br>    Recurridos<br><br>        v.<br><br>Hon. Gabriel Alcaraz Emmanuelli, Secretario de Transportación y Obras Públicas del Estado Libre Asociado<br>    Peticionario<br><br>Hon. Carlos López Nieves<br>Procurador del Cuidadano<br>    Interventor | Certiorari<br><br>2010 TSPR 95<br><br>179 DPR ____ |

Número del Caso: CC-2008-425

Fecha: 16 de junio de 2010

  Tribunal de Apelaciones:

                Región Judicial de San Juan/Humacao, Panel V

  Jueza Ponente:    Hon. Lourdes Velázquez Cajigas

Oficina del Procurador General:

            Lcda. Sarah Y Rosado Morales
            Procuradora General Auxiliar

            Lcdo. Guillermo Mangual Amador
            Procurador General Auxiliar

Abogados de la Parte Recurrida:

            Lcdo. Frank c. Torres Viada
            Lcdo. Manuel Martínez Umpierre
            Lcdo. José A. Andreu García
            Lcdo. Manuel Fernández Mejías

Abogado del Interventor:

            Lcdo. William Marini Román


Materia:  Pleito de clase, sentencia declaratoria injction y  cobro de dinero


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Ismael Herrero, Jr. y otros<br><br>    Recurridos<br><br>          v.<br><br>Hon. Gabriel Alcaraz Emmanuelli, Secretario de Transportación y Obras Públicas del Estado Libre Asociado<br><br>    Peticionario<br><br>Hon. Carlos López Nieves, Procurador del Ciudadano<br><br>    Interventor | | CC-2008-425 |

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 16 de junio de 2010

En el presente recurso se cuestiona la validez de una condición existente en la Ley Núm. 42 de 1 de agosto de 2005, mediante la cual se sujetó la efectividad de dicha ley a la aprobación de la Resolución Conjunta de la Cámara de Representantes sobre el Presupuesto General 2005-2006. Veamos los hechos que originan esta controversia.

**I.**

Durante el año fiscal 2005-2006, y como parte de un plan para paliar la insuficiencia presupuestaria del país, la administración del entonces Gobernador Hon. Aníbal Acevedo Vilá envió a la Cámara de Representantes una serie de medidas que perseguían incrementar los recaudos del erario. Entre éstas, se incluyó el Proyecto de la Cámara de Representantes Núm. 1578 (P. de la C. 1578), el cual

luego de sufrir varias enmiendas, se convirtió en la Ley Núm. 42 de 1 de agosto de 2005 (Ley 42).

La Ley 42 enmendó varios artículos de la Ley de Vehículos y Tránsito de 2000[1] para, en síntesis, aumentar los derechos anuales que debían pagar los automóviles de lujo. La Ley 42 definió los automóviles de lujo como todo aquel automóvil "con un precio de venta de cuarenta mil dólares ($40,000) o más, el cual se utilice para uso privado". Art. 1 de la Ley 42, *supra*, el cual añadió el Art. 1.12A a la Ley de Vehículos y Tránsito. La ley creaba un esquema de cobro escalonado de derechos que dependía del valor del vehículo y del año de fabricación. *Id*.

En relación con la efectividad y vigencia de la Ley 42, eje de la controversia de autos, el P. de la C. 1578 originalmente establecía que ésta entraría en vigor el 1 de julio de 2005. Luego del proyecto sufrir varias enmiendas, el texto final aprobado por ambas cámaras, indicaba en su artículo 6 que:

> Esta Ley entrará en vigor el 1ro de julio de 2005 y su efectividad estará sujeta a que se convierta en Ley la Resolución Conjunta Núm. 445 de la Cámara de Representantes sobre el Presupuesto General para el año fiscal 2005-2006. La vigencia de esta Ley se extenderá hasta el 30 de junio de 2007.

Este texto fue el aprobado por el entonces Gobernador Acevedo Vilá, convirtiéndose así en la Ley Núm. 42 del 1ro de agosto de 2005.

Por otro lado, el entonces Gobernador Acevedo Vilá, haciendo uso de su facultad constitucional, le impartió un

---

[1] 9 L.P.R.A. secs. 5001-5725.

veto de bolsillo a la Resolución Conjunta de la Cámara de Representantes Núm. 445 sobre el Presupuesto General para el año fiscal 2005-2006. Como consecuencia, durante ese año fiscal, por disposición constitucional, siguieron rigiendo las partidas consignadas en la Resolución Conjunta de la Cámara de Representantes Núm. 927 para el año económico 2004-2005, aprobada el 30 de junio de 2004. *Véase* Art. VI, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 427 .

Así las cosas, y ante el veto de la Resolución del Presupuesto por parte del ex Gobernador Acevedo Vilá, tanto el ex Secretario de Transportación y Obras Públicas, Ing. Gabriel Alcaraz Emanuelli, como el ex Secretario de Hacienda, Lcdo. Juan Carlos Méndez Torres, solicitaron al entonces Secretario de Justicia, Lcdo. Roberto Sánchez Ramos, una opinión legal sobre si tenían el deber en ley de cobrar los derechos anuales adicionales establecidos por la Ley 42 a los automóviles de lujo. El Lcdo. Sánchez Ramos, mediante misivas de 19 de junio y de 7 de diciembre de 2006, respondió en la afirmativa, indicándole a ambos titulares que tenían el deber ministerial de hacer cumplir la Ley 42 desde el 1ro de julio de 2005, fecha de su vigencia. Explicó que la cláusula que condicionaba la efectividad de ésta a la aprobación de la Resolución Conjunta del Presupuesto General era nula por ser inconstitucional, por lo que la ley advino efectiva desde la fecha de su vigencia.

Conforme a dicha directriz, tanto el Departamento de Transportación y Obras Públicas como el Departamento de Hacienda comenzaron el cobro de los derechos adicionales. A raíz de ello, varios contribuyentes propietarios de automóviles de lujo, presentaron sendos recursos ante el Tribunal de Primera Instancia, Sala Superior de San Juan, impugnando dicha imposición.[2] En todos los pleitos instados, los demandantes solicitaban, entre otros remedios, una sentencia declaratoria a los efectos de que la Ley 42 no advino efectiva por causa del veto de la Resolución Conjunta del Presupuesto 2005-2006, por lo que el Estado debía abstenerse de cobrar los derechos adicionales y devolver las cantidades ya recaudadas. Se solicitaba, además, que se certificara el pleito como uno de clase.

Luego de varios trámites procesales, innecesarios aquí pormenorizar,[3] el Tribunal de Primera Instancia consolidó todos los casos presentados y certificó el pleito como uno de clase, acogiendo una estipulación presentada por las partes el 1 de noviembre de 2006. Posteriormente, los representantes legales de la clase recurrida cumplieron con

---

[2] Ismael Herrero Jr. y otros v. Gabriel Alcaraz, KPE 06-3456 (904) presentado el 15 de agosto de 2006; Gustavo Mattei v. E.L.A. y otros, KAC 06-5132 (907) presentado el 28 de agosto de 2006; Marisela Boullierce Arbelo y otros v. E.L.A. y otros, KPE 06-3927 (907) presentado el 12 de septiembre de 2006 y Walter Collazo y otros v. E.L.A. y otros, KAC 06-5584 (902) presentado el 13 de septiembre de 2006.

[3] Entre éstos se destaca una petición de intervención del Procurador del Ciudadano de Puerto Rico ("Ombudsman") a la cual se opuso el Estado. Mediante Orden de 6 de diciembre de 2006 el Tribunal de Primera Instancia autorizó su intervención.

los requisitos de notificación exigidos para este tipo de pleito, según establecido por la Regla 20 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 20.

El foro primario fraccionó los procedimientos y atendió en primera instancia unas mociones dispositivas presentadas tanto por el Estado como por la clase recurrida, las cuales versaban sobre la efectividad de la Ley 42.[4]  De una parte el E.L.A., mediante solicitud de sentencia sumaria, arguyó que la condición estatuida en la Ley 42 era inconstitucional por violar la norma de un solo asunto, según la cual la Asamblea Legislativa no puede aprobar proyecto de ley alguno, con excepción de los de presupuesto general, que contenga más de un asunto, el cual debe ser claramente expresado en su título. *Véase* Const. E.L.A., *supra*, Art.III, Sec. 17.  Según el Estado, condicionar la efectividad de una ley a la aprobación de otra, tiene el mismo efecto que aprobar una ley con dos asuntos distintos, pues el objetivo es entrelazar legislaciones inconsistentes con el fin de forzar al Ejecutivo a aprobar la totalidad de las medidas o ninguna. El E.L.A. arguyó que, siendo dicha condición inconstitucional, se debe tener por no puesta y validar el

---

[4] Es menester destacar que en el recurso KPE 06-3927 (907), además de impugnarse la efectividad de la Ley 42, se cuestionó su constitucionalidad a luz de la garantía de la igual protección de las leyes, y el debido proceso de ley sustantivo y procesal, tanto bajo la Constitución de Puerto Rico como bajo la Constitución de los Estados Unidos. Dichas causas de acción no están ante nuestra consideración en este recurso.

resto de la ley que impone el cobro adicional de los derechos anuales a los automóviles de lujo.

La clase recurrida, por su parte, se opuso a la solicitud sumaria y presentó una solicitud de sentencia sumaria a su favor. Arguyó que la mencionada norma constitucional de un solo asunto no estaba en juego en este caso, pues se trata de dos leyes aprobadas independientemente y no de una sola ley en la que se estén regulando dos asuntos distintos, que es lo prohibido por la mencionada cláusula constitucional. Igualmente, argumentó que la Asamblea Legislativa tiene la potestad de condicionar la efectividad de una ley a cualquier plazo, condición, evento futuro o contingencia, incluyendo la aprobación de otra ley. En la alternativa, arguyó que de decretarse inválida la cláusula, entonces la ley era inconstitucional en su totalidad, pues ésta no incluía una cláusula de separabilidad. Por lo tanto, las agencias del Ejecutivo estaban impedidas de cobrar los derechos anuales adicionales estatuidos y debían devolver las sumas ya recaudadas.

El 15 de marzo de 2007 el Tribunal de Primera Instancia emitió sentencia sumaria a favor de la clase recurrida. La sala de instancia declaró que la Ley 42 no había advenido efectiva debido a la desaprobación de la Resolución Conjunta del Presupuesto General 2005-2006 por parte del Gobernador, por lo que su puesta en vigor había sido ilegal. El foro primario concluyó que "condicionar la efectividad de esta medida de recaudo a la aprobación de la

ley de presupuesto general considerada dentro de un esquema presupuestario específico y bajo unas circunstancias particulares no viola norma constitucional alguna". Por lo tanto, le ordenó al Secretario de Transportación y Obras Públicas a "abstenerse de efectuar los recaudos por el importe de los derechos anuales de los vehículos de lujo según fijados por la [Ley 42 y] devolver a los dueños de vehículos de lujo los dineros recibidos, salvo un 33% de lo que será consignado en la Secretaría para el pago de honorarios de abogado".

Inconforme, el E.L.A. acudió al Tribunal de Apelaciones e impugnó la conclusión del foro primario acerca de la efectividad de la Ley 42. Además, cuestionó los honorarios de abogado fijados a la representación legal de la clase recurrida por considerarlos "injustificadamente altos en comparación al valor de los servicios legales prestados por los abogados de los demandantes". El foro intermedio confirmó al Tribunal de Primera Instancia al resolver que la condición incluida en la Ley 42 no violaba la sección 17 del artículo III de la Constitución de Puerto Rico. Por lo tanto, confirmó igualmente la determinación de que la Ley 42 nunca advino efectiva, por lo que el cobro de los derechos anuales adicionales a los automóviles de lujo había sido ilegal. En relación con la controversia sobre los honorarios de abogado, el foro intermedio resolvió que éstos habían sido parte de la estipulación a la cual llegaron las partes el 1 de noviembre de 2006, por

lo que ahora el Estado estaba impedido de cuestionar dicha partida.

Aún inconforme, el E.L.A. acudió ante este Tribunal, cuestionando las decisiones de ambos foros inferiores de validar la condición incluida en la Ley 42.[5] El 19 de septiembre de 2008 expedimos el auto solicitado. Todas las partes comparecieron, por lo que el caso quedó sometido ante nuestra consideración el 9 de enero de 2009. El 27 de enero de 2009, sin embargo, el E.L.A. compareció ante este Tribunal y expresó que, debido al proceso de transición gubernamental, se encontraba reevaluando su posición en torno al recurso presentado. El 30 de junio de 2009 se le ordenó al Estado que en quince (15) días informara a este Tribunal si ya había reevaluado su posición. En cumplimiento de nuestra orden, el 17 de julio de 2009 el Estado compareció, reiterándose en los planteamientos esgrimidos en el alegato anteriormente presentado. Siendo así, y con el beneficio de las comparecencias de todas las partes, pasamos a resolver.

## II.

En el recurso ante nuestra consideración se cuestiona el poder de la Asamblea Legislativa de condicionar la efectividad de una ley a la aprobación de otra ley posterior. Este poder se cuestiona tanto a la luz de la

---

[5] En el alegato presentado, el E.L.A. cuestiona igualmente los honorarios de abogado incluidos en la sentencia del foro de instancia y confirmados por el Tribunal de Apelaciones. En la petición de *certiorari* ante este foro, no obstante, el Estado no incluyó dicho error, por lo que éste no estuvo ante nuestra consideración al momento de expedirse el auto. Por lo tanto, no lo consideraremos.

norma de un solo asunto contenida en la sección 17 del artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, como a la luz del principio de separación de poderes, según éste se concibe en el proceso de aprobación de leyes estatuido en dicho documento.

En primer lugar, el E.L.A. arguye que la condición establecida por la Asamblea Legislativa en la Ley 42 -sujetar la efectividad de dicha ley a la aprobación de la Resolución Conjunta del Presupuesto 2005-2006- es inconstitucional por violar dos disposiciones incluidas en la sección 17 del Artículo III de la Constitución.

Según la Procuradora General, la acción realizada por la Asamblea Legislativa tuvo el efecto de incluir en una sola ley – la Resolución del Presupuesto- una pluralidad de asuntos, lo cual está vedado por dicha cláusula constitucional. Arguye que se trata del mecanismo del *"tie-barring"*, esto es, entrelazar la efectividad de una ley a la aprobación de otra posterior. Según la Procuradora, el *"tie-barring"* es una vertiente del *"logrolling"*, práctica de incluir varios asuntos incongruentes en una misma ley, los cuales por sí solos no tendrían el apoyo de la mayoría legislativa, pero que en conjunto obtendrían una mayoría artificial. A través de su alegato, la Procuradora General establece que el límite al poder legislativo incluido en la sección 17 de la Constitución se realizó, precisamente, para evitar la práctica del *"logrolling"*. Concluye que en tales instancias, para que la Asamblea Legislativa pueda

válidamente condicionar la efectividad de una ley a la aprobación de otra posterior, debe existir el requisito de "germaneidad"[6] entre ambas leyes, por lo que le es aplicable un análisis similar al que se lleva a cabo cuando se alega que una ley regula dos o más asuntos distintos.

Aplicando este análisis, la Procuradora entiende que en este caso no se cumple con el requisito de "germaneidad", pues por disposición constitucional el Presupuesto es una medida de asignación de fondos y la Ley 42 es una medida de recaudo. Así, según el E.L.A., se viola la disposición general de la sección 17 de que todas las leyes deben contener sólo un asunto y simultáneamente se viola la disposición específica de dicha sección que exige que el Presupuesto sólo contenga asignaciones y reglas para su desembolso. Según se alega, al condicionar la efectividad de una ley sustantiva de recaudo a la aprobación del Presupuesto, la primera pasa a formar parte de la Resolución Conjunta, violándose así las disposiciones constitucionales antes mencionadas.

Igualmente, el E.L.A. arguye que validar la condición establecida por la Asamblea Legislativa en la Ley 42 tiene el efecto de subvertir el proceso legislativo establecido constitucionalmente, el cual prohíbe la presión indebida que pueda ejercer la Rama Legislativa en el Ejecutivo en relación con la aprobación o desaprobación de las leyes.

---

[6] El término "germaneidad" no existe en el lenguaje español. Las partes lo traducen del término inglés "germaneness" o "germane" que significa "relevante al asunto bajo consideración". The New Oxford American Dictionary 711 (2001).

Según el alegato del E.L.A., la acción de la Asamblea Legislativa en este caso afecta el poder de veto del Ejecutivo, pues éste se ve obligado a darle su aprobación a un proyecto de ley, en pos de que otra ley anteriormente aprobada advenga efectiva. Según se alega, esta alteración del esquema legislativo constitucional amplía excesivamente los poderes de la Rama Legislativa.

Por último, el E.L.A. arguye que, siendo inconstitucional la condición establecida, la Ley 42 debe declararse nula parcialmente -sólo en relación con la cláusula que sujeta su efectividad a la aprobación de la Resolución del Presupuesto- y validarse el resto. Entiende que ante la crisis fiscal que sufría el país en ese momento -la cual se ha agravado al día de hoy- debe concluirse que la voluntad de la Asamblea Legislativa sería aprobar la medida de recaudo sin la condición inconstitucional.

Por otra parte, la clase recurrida arguye que en este caso no se viola la norma contenida en la sección 17, pues tanto la Ley 42 como la Resolución del Presupuesto 2005-2006 trataban cada una de un solo asunto. La Ley 42 sólo enmendaba varias disposiciones de la Ley de Vehículos y Tránsito para aumentarle los derechos anuales a los automóviles de lujo y el Presupuesto sólo trataba de las asignaciones dinerarias y las reglas del desembolso de las mismas para el funcionamiento del gobierno durante el año económico 2005-2006, por lo que no se infringe la disposición de un solo asunto. Según la clase recurrida, la disposición constitucional lo que prohíbe es la

inclusión en un mismo cuerpo de ley de varios asuntos que no sean "germanos" entre sí. Tal cláusula se incluyó en nuestra Carta Magna para impedir la inclusión de materia incongruente y extraña a una legislación, de manera que se evite la inadvertencia, la ocultación y el fraude. Eso, según se alega, no ocurrió en este caso pues la Asamblea Legislativa tuvo la oportunidad de estudiar y analizar independientemente cada una de las medidas legislativas presentadas.

En relación con el *"tie-barring"*, arguyen que es válido que la Asamblea Legislativa sujete la efectividad de una ley a plazos, condiciones, contingencias o eventos futuros, y que en el ordenamiento jurídico puertorriqueño existen varios ejemplos de dicha práctica. Plantean que si -sólo para propósitos de argumentación- se entendiera que cuando la Asamblea Legislativa sujeta la efectividad de una ley a la aprobación de otra, ambas leyes deben ser "germanas" como arguye la Procuradora, de todos modos el caso ante nuestra consideración cumpliría con tal exigencia. Entienden que ambas medidas están relacionadas, pues una tiene que ver con allegar más fondos al erario y la otra con la asignación y desembolso de dichos fondos.

Igualmente, según la clase recurrida, el poder de veto del Ejecutivo no se ve afectado por este esquema pues la firma por parte del Gobernador de la Ley 42 no aprobaba *ipso facto* el Presupuesto, así como que la aprobación del Presupuesto no aprobaba automáticamente la Ley 42. Ambas

disposiciones requerían del estudio, análisis y firma individual del Gobernador para su aprobación.

En la alternativa, la clase recurrida alega que, de declararse inconstitucional la cláusula incluida en la Ley 42, entonces la ley sería inconstitucional en su totalidad y no sólo su cláusula de vigencia. Según se alega, surge claramente de dicha cláusula la intención legislativa de imponer dicha medida de recaudo solamente si se aprobaba el Presupuesto 2005-2006, lo cual no ocurrió. De igual manera, la Ley 42 carece de una cláusula de separabilidad, lo que impide el que se tengan por no puestas cláusulas de la ley, especialmente aquella en la cual se incluye la vigencia de la ley.

Expuestas las posiciones de las partes, pasemos a repasar el derecho aplicable a la presente controversia.

**III.**

**A.**

La sección 17 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, en su parte pertinente, establece:

> No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas. Ningún proyecto de ley será enmendado de manera que cambie su propósito original o incorpore materias extrañas al mismo.

Const. E.L.A., *supra*, Art. III, Sec. 17.

La citada sección establece la llamada regla de un solo asunto. Esta regla exige que toda ley aprobada por la Asamblea Legislativa regule un solo asunto o materia. El asunto tratado en la ley debe estar adecuadamente expresado en su título, pues de no ser así, la parte de la ley omitida del título se entenderá nula. *Dorante v. Wrangler of P.R.*, 145 D.P.R. 408, 427 (1998). Asimismo, la disposición constitucional exige que toda enmienda a la ley sea afín al asunto regulado.

La regla de un solo asunto puede trazar sus orígenes a la antigua Roma en la cual se prohibió que se aprobaran leyes con disposiciones no relacionadas entre sí, evitando que se incluyeran materias antipáticas en leyes que probablemente serían aprobadas por contar con el favor popular. *Véase* M.H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 Minn. L. Rev. 389 (1958); M.D. Gilbert, *Single Subject Rules and the Legislative Process*, 67 U. Pitt. L. Rev. 803, 811 (2006). La primera experiencia en los Estados Unidos con la regla de un solo asunto fue en 1818, cuando el estado de Illinois incluyó una disposición en su Constitución que prohibió que se incluyeran otros asuntos en leyes relacionadas con los salarios de empleados gubernamentales. Ruud, *supra*; Gilbert, *supra*, pág. 812. Luego, en 1844, New Jersey fue el primer estado en incluir una regla de un solo asunto general. Ruud, *supra*, pág. 390; Gilbert, *supra*. Para 1959, 43 estados tenían disposiciones similares en sus constituciones. Gilbert, *supra*.

En Puerto Rico, la regla de un solo asunto fue introducida por el artículo 34 de la Carta Orgánica Jones de 1917, como parte del detallado proceso legislativo incluido en dicha ley.[7] La Comisión de la Rama Legislativa de la Convención Constituyente, por recomendación de la Escuela de Administración Pública de la Universidad de Puerto Rico, decidió incorporar la mayoría de las restricciones y resguardos al proceso legislativo que incluía la Ley Jones a la Constitución de 1952, entre éstas, la regla de un solo asunto. J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Editorial de la Universidad de Puerto Rico, 1982, Vol. III, pág. 159; Escuela de Administración Pública, *La Nueva Constitución de Puerto Rico*, Edición facsimilar de la primera edición 1954, San Juan, Editorial de la Universidad de Puerto Rico, 2005, págs. 402-04.

En varias de las ocasiones en las cuales hemos interpretado esta disposición, expresamos que su propósito primordial es:

> impedir la inclusión en la ley de materia incongruente y extraña, y a la vez poner en guardia contra la inadvertencia, la ocultación y el fraude en la legislación . . . evitar la práctica corriente en todas las legislaturas donde no existe tal disposición, de incluir en la ley materias incongruentes que no tienen relación alguna entre sí o con el sujeto especificado en el título, a virtud de lo cual se aprueban

---

[7] Dicho proceso legislativo tan detallado es influencia de varias constituciones estatales, entre éstas, la Constitución de Illinois, de donde era oriundo el Senador Shafroth, coautor de la Ley Jones ("Jones-Shafroth Act"). *Véase* J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Editorial de la Universidad de Puerto Rico, 1982, Vol. III, pág. 159.

> medidas sin atraer atención que, si hubieran sido
> vistas, hubieran sido impugnadas y derrotadas.
> Así parece evitar sorpresas en la legislación.
>
> *Rivera Ayala v. Corte*, 62 D.P.R. 513, 539 (1943)
> (Citas Omitidas).

*Véase además*, *Dorante v. Wrangler of P.R.*, *supra*, pág. 428; *Cervecería Corona, Inc. v. Junta de Salario Mínimo*, 98 D.P.R. 801 (1970); *Pueblo v. Pérez Méndez*, 83 D.P.R. 228, 230 (1961); *Sunland Biscuit Company, Inc. v. Junta de Salario Mínimo*, 68 D.P.R. 371, 380 (1948); *Laboy Montes v. Corp. Azucarera Saurí & Subirá*, 65 D.P.R. 422, 426 (1945).

Así pues, la cláusula se introdujo, para prevenir el "*logrolling*" o las concesiones mutuas en la aprobación de las leyes. El "*logrolling*" es una práctica legislativa a través de la cual grupos minoritarios de legisladores combinan, en un solo proyecto de ley, distintas propuestas incongruentes entre sí, con el propósito de que al momento de la votación de dicha medida, ésta obtenga una mayoría artificial proveniente de la unión de esos grupos. N.J. Singer & J.D.S. Singer, *Statutes and Statutory Construction*, 7th Ed., West, 2009, Vol. 1A, sec. 17.1, pág. 7. Los delegados de la Convención Constituyente eran conscientes de dicha práctica, pues se discutió como parte de la recomendación que hizo la Comisión de la Rama Legislativa. Dicha Comisión en su informe indicó que:

> Las disposiciones sobre título y asunto impiden
> prácticas fraudulentas, facilitan la labor
> legislativa y hacen imposible que grupos
> minoritarios incorporen sus proposiciones
> favoritas en una sola pieza de legislación y se
> unan para obtener una mayoría artificial, la cual
> no existiría si las distintas proposiciones se
> consideraran separadamente.

4 Diario de Sesiones de la Convención Constituyente 2584 (1961).

Esta práctica es altamente criticable, pues contraviene el diseño legislativo, ya que cada una de las propuestas independientes probablemente no lograrían una mayoría legislativa por méritos propios. *Véase* Singer & Singer, *op. cit*; Ruud, *supra*, págs. 391 & 448; Gilbert, *supra*, págs. 813-14; M.J. Dragich, *State Constitutional Restrictions on Legislative Procedure: Rethinking the Analysis of Original Purpose, Single Subject, and Clear Title Challenges*, 38 Harv. J. on Legis. 103, 114-15 (2001); J.G. Knowles, Note: *Enforcing the One-Subject Rule: The Case for a Subject Veto*, 38 Hastings L.J. 563 (1987).

Una de las modalidades más conocidas del "*logrolling*" son los llamados "*riders*". Los "*riders*" son disposiciones de ley no relacionadas con el asunto principal de la legislación, y muchas veces no favorecidas por la mayoría legislativa, que son añadidas o "montadas" en proyectos de ley los cuales, ya sea por su aceptación pública o por su necesidad para el buen funcionamiento del gobierno, probablemente serán aprobados. *Véase* Singer & Singer, *op. cit.*, págs. 7-8. *Véase también* J.J. Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos*, Bogotá, Editorial Temis S.A., 2009, pág. 244. La disposición constitucional busca evitar principalmente esta modalidad del "*logrolling*". Así, el delegado de la Convención Constituyente Negrón Fernández explicó:

Esta oración "no se aprobará ningún proyecto de ley con excepción de los de presupuesto general que contenga más de un asunto, el cual deberá ser claramente expresado en su título" es una disposición encaminada a evitar los *riders*, a evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto aprobando subrepticiamente algo que la Asamblea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de haber conocido la intención.

2 Diario de Sesiones de la Convención Constituyente 896 (1961).

Generalmente, se arguye que la inclusión de *"riders"* en la legislación afecta principalmente el poder de veto del Ejecutivo, pues éste tiene que escoger entre aprobar una ley necesaria para el funcionamiento del gobierno, la cual incluye una disposición incongruente con el asunto principal de la ley y que desfavorece, o vetar la ley en su totalidad. El ejemplo por antonomasia de una ley susceptible de que le sean añadidos *"riders"* es la Resolución del Presupuesto General, pues la aprobación de ésta es necesaria para el funcionamiento de todas las dependencias del gobierno, por lo que generalmente es aprobada. Es por esta razón que en Puerto Rico, y en varios estados de Estados Unidos, existe una disposición específica que establece que, aun cuando la medida del Presupuesto puede versar sobre varios asuntos, sólo puede contener asignaciones de fondos y reglas para su desembolso. *Véase* Const. E.L.A., *supra*, Art. III, Sec. 17. *Véase además*, *El Pueblo v. Foote, Juez*, 48 D.P.R. 492 (1935).

En relación con el requisito de que el asunto regulado por la ley esté expresado en su título, hemos indicado en varias ocasiones que el propósito es informar al público en general y a los legisladores en particular del asunto del cual es objeto la ley, de manera que se impida la inclusión de materia incongruente y extraña. *Dorante v. Wrangler of P.R.*, *supra*; *Cervecería Corona, Inc. v. J.S.M.*, *supra*. Dicha disposición, no obstante, no "requiere que el título constituya un índice detallado del contenido de la ley, sino meramente que sea un hito indicador del asunto cubierto por la misma". *Pueblo v. Pérez Méndez*, *supra*, citando a *Sunland Biscuit Company, Inc. v. Junta de Salario Mínimo, supra* y *Rodríguez v. Corte*, 60 D.P.R. 919, 922 (1942).

Así, la conjunción de la regla de un solo asunto con la de que éste sea incluido en su título logra: 1) prevenir la práctica del "*logrolling*"; 2) impedir la aprobación desapercibida de un proyecto de ley con disposiciones que no son advertidas en su título ("*riders*"); 3) informar razonablemente a la ciudadanía sobre los asuntos contenidos en cada uno de los proyectos de ley presentados; 4) prevenir la ocultación y el fraude en la legislación; y 5) evitar que se diluya el poder de veto del Ejecutivo. *Véase* Singer & Singer, *op. cit.*, pág. 10.

Nuestros precedentes, sin embargo, han sido consistentes en establecer que sólo ante un caso claro y terminante se justifica anular una ley por violar dicha disposición constitucional. *Dorante v. Wrangler of P.R.*,

*supra,* págs. 429-31 y casos allí citados. Se dice que hemos "adoptado una postura comprensiblemente laxa para no maniatar al legislador". Álvarez González, *op. cit.* Así es. Una interpretación estricta de la disposición constitucional podría impedir y obstaculizar el proceso legislativo, pues obligaría al legislador a aprobar múltiples leyes para regular un sólo asunto o materia general. Ruud, *supra*, págs. 393-94; Knowles, *supra*, pág. 574. El requerimiento no está diseñado como subterfugio para destruir legislación válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada proyecto de ley se discuta y se analice a cabalidad antes de ser aprobado.

Por lo tanto, al examinarse la validez de una ley a la luz de la regla de un sólo asunto, es necesario auscultar todas sus disposiciones para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título. *Cervecería Corona v. JSM*, *supra*, pág. 812. Lo que comprende "un sólo asunto" se interpreta liberalmente, sin dejar de lado el propósito y objetivo de la exigencia constitucional. En ese tenor, "un estatuto puede comprender todas las materias afines al asunto principal y todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general". R.E. Bernier & J.A. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto*

*Rico*, Segunda Edición, San Juan, Publicaciones JTS, 1987, pág. 81.

**B.**

Por otro lado, la sección 19 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico establece el proceso de aprobación de leyes. Como es sabido, luego de que una mayoría del número total de miembros de cada cámara aprueba un proyecto de ley, éste se somete al Gobernador y se convertirá en ley si aquél lo firma o no lo devuelve con sus objeciones a la cámara de origen dentro de los diez días de haberlo recibido. Const. E.L.A., *supra*, Art. III, Sec. 19. En casos en que la Asamblea Legislativa levante la sesión antes de expirar el plazo de diez días de haberse sometido un proyecto al Gobernador, éste quedará relevado de la obligación de devolverlo con sus objeciones, y se convertirá en ley sólo si el Gobernador lo firma dentro de los treinta días de haberlo recibido. *Id.*

El esquema de aprobación de leyes antes mencionado es parte esencial de la doctrina de separación de poderes que entraña nuestra Constitución. El poder de veto del Ejecutivo es una de las manifestaciones de la doctrina, en cuanto condiciona el poder de la Asamblea Legislativa al consentimiento del Gobernador a toda legislación propuesta. Así, a pesar de que es la Rama Legislativa quien tiene la función principal de hacer las leyes, la Constitución le concede un poder a la Rama Ejecutiva de sancionar o desaprobar las mismas conforme a su mandato. *Véase* Const.

E.L.A., *supra*, Art. IV, Sec. 4. Se trata entonces de un poder compartido, el cual le impone deberes y obligaciones recíprocas al Gobernador y a la Asamblea Legislativa.

El poder del Ejecutivo en el proceso de aprobación de leyes, no obstante, es limitado, pues el Gobernador sólo puede aprobar o desaprobar un proyecto sometido ante su consideración en su totalidad, salvo que dicho proyecto de ley asigne fondos en más de una partida. *Véase* Const. E.L.A., *supra*, Art. III, Sec. 20. Por lo tanto, salvo el veto de partidas antes mencionado, el Gobernador está incapacitado de eliminar o enmendar disposiciones específicas de un proyecto de ley que se le haya presentado para conformarlo a su mejor parecer. No existe en nuestra jurisdicción, ni en la federal, un veto de asuntos o disposiciones. *Clinton v. City of New York*, 524 U.S. 417 (1997); Knowles, *supra*, pág. 590.

Precisamente por esa razón se entiende que el incluir "*riders*" en la legislación afecta el poder de veto del Ejecutivo. En la medida en que se incluye en un proyecto de ley una materia no relacionada o vinculada al asunto principal que dicho proyecto regula, se podría circunvalar la facultad de veto del Gobernador. Esto es así, pues en esos casos se coloca al Ejecutivo en la disyuntiva de aprobar una ley que incluya el "*rider*" o desaprobar la misma en su totalidad. De ser la legislación presentada necesaria, probablemente el Ejecutivo le impartirá su aprobación al proyecto de ley, aunque no esté de acuerdo con el "*rider*" incluido. Así, el asunto extraño o

incongruente a la legislación principal pasa el escrutinio del Ejecutivo "montado" sobre ésta, sin que éste tenga la oportunidad de sopesarlo de manera independiente. Ciertamente permitir un esquema como el mencionado laceraría el "complejo sistema de pesos y contrapesos que asegura una interacción entre los tres componentes del sistema de gobierno y que genera un equilibrio dinámico que evita que una de las ramas amplíe su autoridad debilitando a las otras". *Noriega Rodríguez v. Hernández Colón*, 135 D.P.R. 406, 458-59 (1994) citando a *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 427-28 (1982) y *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 612-622 (1983).

## C.

En relación con la vigencia de las leyes, la sección 5 del artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico establece que cada ley deberá ser promulgada conforme al procedimiento que se prescriba por ley y contendrá sus propios términos de vigencia. Const. E.L.A., *supra*, Art. VI, Sec. 5. Por tanto, "las leyes comienzan a regir cuando en ellas así se establezca expresa o tácitamente, bien con referencia a una fecha de calendario, o *bien con referencia a algún otro dato*". *González Natal v. Merck Sharp & Dohme Química de P.R., Inc.*, 166 D.P.R. 659, 675 (2006) (Énfasis suplido).

Como consecuencia necesaria de dicha disposición constitucional, es a la Asamblea Legislativa a quien le compete establecer la fecha de vigencia de las leyes aprobadas. *Véase González Natal v. Merck*, *supra*, pág. 691

(Op. de Conformidad Juez Presidente Hernández Denton).
Así, la Asamblea Legislativa puede disponer que la vigencia
de la ley sea inmediata con la aprobación de ésta o, por el
contrario, que su vigencia sea aplazada por un término
específico. *González Natal v. Merck*, *supra*, pág. 675.
Esta determinación es parte inherente de la facultad de la
Asamblea Legislativa de aprobar las leyes y dependerá del
juicio del legislador sobre la necesidad de una vigencia
inmediata o aplazada de la ley en cuestión.

Así como la Asamblea Legislativa tiene la facultad de
sujetar la vigencia de una ley a un plazo, puede igualmente
sujetarla a una condición o evento futuro. Aunque no nos
habíamos expresado al respecto anteriormente, esto es una
facultad inherente reconocida al Poder Legislativo en todo
sistema republicano de gobierno. *Véase* E.T. Crawford, *The
Construction of Statutes*, St. Louis, Thomas Law Book Co.,
1940, sec. 109, pág. 157. Dicha condición puede tratarse
de una contingencia, tal como el resultado de una elección,
la aprobación de una enmienda constitucional, o la
aprobación de otra ley. Singer & Singer, *op. cit.,* Vol. 2,
sec. 33.7, pág. 20. Las razones que puede tener el
legislador para tomar este curso de acción son diversas,
pero generalmente se trata de la conveniencia o eficacia de
la ley condicionada. *Véase* T.M. Cooley, *Cooley's
Constitutional Limitations*, 8th Ed., Boston, Little, Brown
& Co., 1927, Vol. 1, pág. 240. Esto es, en ocasiones la ley
condicionada no tendría sentido en el ordenamiento de no
acontecer la contingencia prevista.

Aunque esta práctica, llamada *"tie-barring"* en los Estados Unidos, no es usual, no es totalmente desconocida para nuestra Asamblea Legislativa. Podemos encontrar algunos ejemplos en el ordenamiento puertorriqueño en los cuales la Legislatura ha condicionado la entrada en vigor de leyes a contingencias, como por ejemplo, la aprobación de enmiendas constitucionales.[8] Normalmente, esta práctica legislativa se ha utilizado como parte de la aprobación de legislación abarcadora en relación con un asunto específico, el cual es regulado a través de varias leyes independientes, pero relacionadas entre sí.[9]

La potestad de la Asamblea Legislativa para condicionar la vigencia de las leyes, no obstante, no es irrestricta. La condición impuesta a la vigencia o efectividad de una ley tendrá que ser compatible, como toda otra disposición estatutaria, con las salvaguardas establecidas en nuestra Constitución. Así como la Asamblea

---

[8] Véase Ley Núm. 70 de 29 de junio de 1995, la cual enmendaba el artículo 3.001 de la Ley Núm. 81 de 30 de agosto de 1991, Ley de Municipios Autónomos, y que disponía, en su parte pertinente, "esta ley tendrá carácter prospectivo y entrará en vigor una vez se apruebe una enmienda al Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico limitando los términos a los cargos de Representante, Senador y Gobernador". 21 L.P.R.A. sec. 4101 (Historial). Igualmente, la Ley Núm. 82 de 13 de agosto de 1994, la cual enmendaba las Reglas 6.1 y 218 de Procedimiento Criminal y que en su parte pertinente disponía "esta ley entrará en vigor una vez se apruebe la enmienda propuesta a la Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico conforme se dispone en la Resolución Concurrente de la Cámara Núm. 32 de 16 de mayo de 1994". 34 L.P.R.A. Ap. II, R. 6.1 & 218 (Historial).

[9] *Véase Gaulden v. Kirk*, 47 So. 2d 567 (1950), caso en el cual la Legislatura de Florida entrelazó tres leyes de recaudos, pues eran parte de un plan integrado de imposición de contribuciones estatales.

Legislativa está impedida de crear legislación que imponga condiciones que laceren la Carta de Derechos del individuo,[10] igualmente está impedida de incluir disposiciones condicionales que contravengan el detallado proceso legislativo y de aprobación de leyes que los constituyentes incluyeron en nuestra Carta Magna.

Así pues, una condición que sujete la vigencia o efectividad de una ley a una contingencia que sea extraña o no esté razonablemente relacionada con la ley en cuestión, podría violar la regla de un solo asunto. Esto, en la medida en que la condición haría referencia, y sujetaría el advenimiento a la vida jurídica de esa ley, a un asunto que no es afín con la ley aprobada. La condición, entonces, sería una disposición desvinculada del asunto general que la ley regula, pues no sería accesoria o complementaria al objetivo de la ley aprobada, violando así la disposición constitucional. En la doctrina estadounidense, se ha expresado que "[l]egislation may be made to take effect upon the happening of a specified contingency, **provided the contingency is germane to the subject of the legislation.**" Singer & Singer, *op. cit.,* Vol. 1A, sec. 20.24, pág. 156. (Énfasis suplido).

Al tratarse de dos leyes independientes, pero unidas por la cláusula de vigencia, el análisis se centra en la razonabilidad de la relación entre los asuntos regulados por ambas leyes. Es decir, al examinar si se cumple con el

---

[10] Nos referimos a la llamada doctrina de condiciones inconstitucionales. *Véase, e.g., Morales Morales v. E.L.A.,* 126 D.P.R. 92 (1990).

requisito constitucional de un solo asunto en estos casos, se debe satisfacer el requisito de que los asuntos regulados por ambas leyes tengan una relación razonable, de modo que haya cierto vínculo de interdependencia entre una ley y la otra. Así, se ha dicho que "[t]he event or change of circumstances on which a law may be made to take effect must be such as, in the judgment of the legislature, affects the question of the expediency of the law; an event on which the expediency of the law in the opinion of the law-makers depends." Cooley, *op. cit.* Al exigir esa relación de relativa interdependencia entre ambas leyes, se garantiza que la contingencia incluida por la Asamblea Legislativa no sea el ejercicio del poder legislativo de manera arbitraria o caprichosa, sino que sea como parte de la eficacia o conveniencia de la ley condicionada.[11]

Ese es el resultado al cual han arribado las pocas jurisdicciones estadounidenses que se han enfrentado a controversias similares. Así, en *In re Advisory Opinion to the Governor*, 239 So. 2d 1 (1970), el Tribunal Supremo de Florida resolvió que sujetar la efectividad de una asignación presupuestaria contenida en el Presupuesto General del Estado a la aprobación de una medida de recaudo, no contravenía la regla de un solo asunto, pues se

---

[11] En *Helmsley v. Ft. Lee*, 78 N.J. 200 (1978), el Tribunal Supremo de New Jersey, citando a *Hudspeth v. Swayze*, 85 N.J.L. 592 (1914), indicó que "[i]t makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and legal one, not opposed to sound policy, **and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one**." (Énfasis suplido).

trataban de medidas razonablemente relacionadas. Expresó dicho Tribunal que "appropiations may constitutionally be made contingent upon matters or events reasonably related to the subject of appropriation, but may not be made to depend upon entirely unrelated events." *In re Opinion to the Governor*, *supra*, pág. 9. *Véase también Gaulden v. Kirk*, 47 So. 2d 567 (1950); 1979-1980 *Mich. Op. Atty. Gen.* 128.

Permitirle a la Asamblea Legislativa que ate la vigencia o efectividad de una ley válidamente aprobada a la posterior aprobación de otra ley desvinculada de la original, subvertiría el proceso de aprobación de leyes, pues contravendría las prerrogativas del Ejecutivo e inclusive de legisladores individuales. En la medida en que una ley ya aprobada no advenga efectiva hasta la aprobación de otra ley no relacionada razonablemente con la original, se coloca al Ejecutivo en la misma disyuntiva que cuando se le añade un *"rider"* a una legislación: tendría que escoger entre aprobar la ley posterior, aunque no esté de acuerdo con ésta, o desaprobarla, con la consecuencia de que la anteriormente aprobada no advendrá a la vida jurídica. La inclusión de una condición arbitraria a la efectividad de una ley válidamente aprobada no sería un ejercicio razonable del poder legislativo, pues no se incluiría en pos de la conveniencia o eficacia de la legislación sino, probablemente, como una medida de presión indebida a la Rama Ejecutiva y a legisladores individuales. No es posible que a través de ese artilugio, se pueda

realizar lo que está vedado por la cláusula constitucional de un solo asunto.

Establecido lo anterior, debemos auscultar si en este caso existía una relación razonable entre los asuntos regulados por la Ley 42 y la Resolución del Presupuesto General 2005-2006, de manera que podamos determinar si la Asamblea Legislativa actuó válidamente al condicionar la efectividad de la primera a la aprobación de la última.

## IV.

Para entender a cabalidad la controversia ante nuestra consideración, debemos primeramente repasar el proceso de aprobación del Presupuesto General del país, según dispuesto en la Constitución. Por mandato de la cláusula 9 de la sección 4 del artículo IV de la Constitución, el trámite legislativo para la aprobación del presupuesto comienza con el mensaje de estado del Gobernador a la Asamblea Legislativa. Const. E.L.A., *supra*, Art. IV, Sec. 4. En este mensaje, el Gobernador debe ofrecer un informe detallado sobre los propuestos ingresos y desembolsos para el próximo año económico. *Id*. A través de ese informe, la Asamblea Legislativa se asegura que el Primer Ejecutivo cumpla con la obligación constitucional de que las asignaciones propuestas no excedan el cálculo de los recursos totales, salvo que éste proponga, y sean aprobadas, contribuciones suficientes para cubrir el

exceso.[12] *Véase* 4 Diario de Sesiones de la Convención Constituyente 2587 (1961).

Conforme al proceso antes expuesto, el 16 de marzo de 2005 el entonces Gobernador Acevedo Vilá presentó ante la Asamblea Legislativa su Informe Anual sobre la situación de estado del país. Posteriormente, presentó ante la Cámara de Representantes un anteproyecto de resolución conjunta que recomendaba las asignaciones para el Presupuesto General del año económico 2005-2006. Esta resolución, luego de ser estudiada, analizada y enmendada por ambas cámaras legislativas, se convirtió en la Resolución Conjunta de la Cámara de Representantes Núm. 445.

Paralelamente, el Gobernador envió a la Cámara de Representantes varios proyectos de administración, los cuales constituían medidas de recaudos para allegar más fondos recurrentes al Fondo General y así solucionar el llamado déficit estructural. Según la ponencia que presentara ante la Cámara de Representantes el entonces Secretario de Hacienda, Lcdo. Juan Carlos Méndez, sobre el P. de la C. 1578 que luego se convirtió en la Ley 42, "el presupuesto de Ingresos y Gastos para el año fiscal 2006 . . . incluye como parte de los estimados de ingresos netos al Fondo General los recursos proyectados que se generarían mediante medidas legislativas. **La presente medida ante su consideración es una necesaria para enfrentar el mencionado**

---

[12] Para una exposición más detallada del proceso de aprobación del Presupuesto, véase *Presidente de la Cámara v. Gobernador*, 167 D.P.R. 149, 177-193 (2006) (Op. Disidente Juez Asociada señora Rodríguez Rodríguez).

**déficit estructural**.      Más adelante, el Secretario establece que "[e]sta medida tiene el potencial de aumentar los recaudos recurrentes al Fondo General por aproximadamente $30 millones. **Estos recaudos serían utilizados como parte del Presupuesto de Gastos del Gobierno Central del próximo año fiscal 2006**".

Asimismo, la entonces Directora de la Oficina de Gerencia y Presupuesto (OGP), Ileana I. Fas Pacheco mediante su comparecencia a la Cámara de Representantes para la discusión del P. de la C. 1578, indicó que "[t]anto con las medidas propuestas para aumentar los ingresos, como las de control de gastos para reducir el déficit presupuestario; **el presupuesto que se recomienda para el año fiscal 2005-2006 está cuadrado, balanceado utilizando únicamente fuente(s) de ingresos recurrentes para gastos operacionales**".

Surge entonces de las comparecencias de los titulares de las agencias del Ejecutivo a quienes les corresponde la preparación de la propuesta del Presupuesto -la Directora de OGP y el Secretario de Hacienda- que el P. de la C. 1578 era una medida de recaudo para completar los recursos totales del Fondo General, de modo que se pudiera cumplir con la obligación constitucional de presentar un presupuesto en el cual las asignaciones no excedieran los recursos.    Esta acción no es inusual en el proceso de aprobación del Presupuesto General, pues comúnmente el Ejecutivo presenta, junto a su anteproyecto de resolución conjunta, medidas de recaudo o emisiones de deuda para

balancear las asignaciones contenidas en éste con los recaudos estimados para el año económico determinado. Este caso es un ejemplo de esta práctica, pues la Ley 42 era, precisamente, parte de las medidas impositivas que necesitaban aprobarse para cubrir el exceso de las asignaciones comparado con los recursos totales estimados para el año económico 2005-2006.

Por lo tanto, al examinar la Resolución Núm. 445 del Presupuesto General 2005-2006 y la Ley 42, no nos queda más que concluir que existe una relación directa entre ambas medidas legislativas. Sin la aprobación de la Ley 42, el Presupuesto General 2005-2006, de haberse aprobado, hubiese sido deficitario, pues las asignaciones allí contenidas habrían rebasado los recursos totales. Siendo así, la condición establecida por la Asamblea Legislativa a la efectividad de la Ley 42 fue razonable, pues existía una relación de interdependencia entre ambas leyes.

Aun cuando la Ley 42 pudo haberse aprobado sin condicionarse su efectividad a la eventual aprobación del Presupuesto General, somos del criterio que dicha acción no fue irrazonable o arbitraria por parte de la Asamblea Legislativa. Después de todo, la Asamblea Legislativa pudo razonablemente entender que de no aprobarse las asignaciones presentadas en la Resolución Núm. 445, según enmendada por ambas cámaras, no era necesaria la aprobación de nuevas medidas de recaudos, como lo es la imposición de un aumento a los derechos anuales de los automóviles de lujo. Por consiguiente, la condición incluida no es

incongruente o extraña al asunto regulado por la ley. Al contrario, existe una relación entre ambas medidas que sostiene la razonabilidad de la condición impuesta.

La Procuradora General arguye, como mencionamos anteriormente, que para que se entienda que una ley es afín a la Resolución Conjunta del Presupuesto, dicha ley debe sólo contener asignaciones y reglas para su desembolso, según el mandato constitucional. Este argumento soslaya el hecho de que se trata de dos cláusulas constitucionales separadas con dos análisis aplicables distintos. Una cuestión es determinar si –bajo la cláusula de un solo asunto– es válida la actuación de la Asamblea Legislativa de atar la vigencia de la Ley 42 a la eventual aprobación del Presupuesto. Es en este análisis que procede auscultar si los asuntos regulados por ambas leyes son afines, pues lo exige dicha cláusula constitucional. Examinada la validez del ejercicio legislativo cuestionado, a la luz del análisis correspondiente a la cláusula de un solo asunto, concluimos anteriormente que el mismo fue razonable por la relación de relativa interdependencia que existe entre ambas leyes.

No obstante, otro asunto distinto es si la Resolución Conjunta Núm. 445 sobre el Presupuesto General cumplía con la norma constitucional de que éste sólo puede contener asignaciones y reglas para su desembolso, aún cuando la Ley 42 estuviera condicionada a su aprobación. Ciertamente, si la Ley 42 o una medida similar a esa, hubiese sido incluida en el texto de la Resolución del Presupuesto General, dicha

disposición probablemente sería inconstitucional en tanto se trataba de una medida de recaudo y, por disposición constitucional, el Presupuesto sólo puede contener asignaciones y reglas para su desembolso. Sin embargo, esa no fue la situación presentada ante nuestra consideración en este caso. No podemos perder de perspectiva que se trata de dos leyes que, aunque se encuentran unidas por la cláusula de vigencia, siguieron un curso legislativo independiente y fueron aprobadas por la Asamblea Legislativa en procesos separados. Por lo tanto, la inclusión de la condición a la vigencia de la Ley 42 no violó la disposición constitucional aludida por la Procuradora General pues la Resolución Conjunta Núm. 445 sólo contenía asignaciones y reglas para su desembolso, tal y como lo exige la Constitución.

Por otro lado, la Procuradora General arguye igualmente que en este caso la condición se incluyó como parte de una presión indebida ejercida por la Asamblea Legislativa hacia el entonces Gobernador, para que éste firmara la Resolución Conjunta Núm. 445. Aduce que el historial legislativo de la medida está huérfano de razones que sustenten la enmienda introducida en el Senado, por lo que la única explicación plausible es que se trató de un esquema de presión de la Rama Legislativa al Ejecutivo. Sostiene que "el diseño constitucional, en lo concerniente a la aprobación de las leyes, prohíbe la extorsión legislativa y las ataduras inaceptables a las facultades conferidas al Ejecutivo".

Un sistema republicano como el nuestro está diseñado para que exista una imbricación entre los tres Poderes gubernamentales. Esto es, no existe una separación absoluta entre las Ramas y nunca se pretendió que existiera. *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66, 71 (1944). Esta imbricación resulta en una fricción natural entre las Ramas, especialmente entre la Ejecutiva y la Legislativa, las Ramas políticas, las cuales tienen el compromiso recíproco de propulsar los programas de gobierno y garantizar el bienestar de todos aquellos que en nuestro país residen. El propósito del diseño constitucional, entonces, no fue evitar las fricciones, sino salvar al pueblo de la autocracia a través, precisamente, de la fricción inevitable incidental a la distribución de dichos Poderes gubernamentales. *Banco Popular, Liquidador v. Corte*, *supra*. Pero este diseño y su fino balance, garantizó que cada una de las Ramas tenga las herramientas necesarias para evitar que la otra pueda acumular indebidamente el Poder gubernamental. Por lo tanto, la dinámica gubernamental entre ambas Ramas queda en la arena política, mientras las actuaciones no ofendan los contornos de Poder asignados a cada una por la Constitución. Es sólo en estas ocasiones que tenemos la obligación constitucional de intervenir y definir los límites del Poder de cada una de las Ramas.

Un mero resultado adverso a la pretensión de una de las Ramas, no obstante, no justifica que invalidemos una actuación de la otra, amparándonos en una alegada "presión

indebida", en ausencia de una verdadera usurpación de poderes. Es natural que en el proceso constitucional de elaborar y aprobar el Presupuesto General del país existan presiones entre las dos Ramas llamadas a trabajar en conjunto para lograr dicho fin. Mientras esa interacción no desemboque en actuaciones que ofendan la Constitución, estamos impedidos de intervenir. En este caso, la actuación legislativa no tuvo el efecto de eliminar o disminuir las prerrogativas del Ejecutivo. Dado que la condición establecida en la Ley 42 estaba razonablemente relacionada con la Resolución del Presupuesto General 2005-2006, el entrelazar ambas medidas no tuvo el mismo efecto que cuando se incluye un *rider* en la legislación. El Ejecutivo mantuvo tanto su poder de veto en relación con la Ley 42, como su poder de veto y de veto de partidas en relación con la Resolución del Presupuesto General, por lo que no existen razones que nos obliguen a invalidar la legislación impugnada.

En suma, somos del criterio que, en este caso, el condicionar la vigencia de la Ley 42 a la eventual aprobación de la Resolución General del Presupuesto fue un ejercicio legítimo del Poder Legislativo, por lo que dicha condición es válida. Por consiguiente, ante el veto de bolsillo que le impartió el Gobernador Acevedo Vilá a la Resolución Núm. 445 sobre el Presupuesto General 2005-2006, es forzoso concluir que la Ley 42 no advino efectiva. En ausencia de legislación válida que autorizara la imposición de derechos anuales adicionales a los automóviles de lujo,

según definidos en la Ley 42, las actuaciones de los Secretarios de Hacienda y de Transportación y Obras Públicas fueron *ultra vires* y, por lo tanto, radicalmente nulas. Por lo tanto, procede la devolución de las cantidades ilegalmente cobradas por concepto de los derechos anuales adicionales.

A pesar del resultado al que arribamos, este Tribunal no está ajeno al difícil estado de las finanzas públicas en nuestro país. Un desembolso inmediato de los fondos concernidos podría erosionar aún más las ya menguadas arcas estatales. No hay duda de que la situación es compleja y reclama creatividad judicial, de manera que se pueda diseñar un remedio que permita restituir a los contribuyentes su dinero y, a la vez, no se perjudique al extremo el erario. Las posibilidades son diversas y dependerán del entendimiento y la buena fe con la cual ambas partes afronten la etapa de ejecución de la sentencia. *Véanse*, a modo de ejemplo, las recomendaciones incluidas en la Op. de Conformidad del Juez Asociado señor Martínez Torres. En ese tenor, esperamos que –a la luz del resultado al que llegamos el día de hoy– el Estado y la clase recurrida, junto al foro de instancia, puedan idear un remedio adecuado a través del cual se puedan atender justa y satisfactoriamente los intereses de ambas partes.

Por los fundamentos antes expuestos, se confirma la sentencia del Tribunal de Apelaciones, así como la del Tribunal de Primera Instancia. Se devuelve al foro

primario para que se diseñe un remedio que considere adecuadamente los intereses de las partes concernidas.

Se dictará sentencia de conformidad.


Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ismael Herrero, Jr. y otros<br><br>    Recurridos<br><br>        v.<br><br>Hon.    Gabriel    Alcaraz Emmanuelli, Secretario de Transportación   y    Obras Públicas  del  Estado  Libre Asociado<br><br>    Peticionario<br><br>Hon.  Carlos  López  Nieves, Procurador del Ciudadano<br><br>    Interventor | CC-2008-425 |

SENTENCIA

San Juan, Puerto Rico, a 16 de junio de 2010

    Por  los  fundamentos  expresados  en  la  Opinión  que antecede  los  cuales  se  incorporan  íntegramente  a  la presente,  se  dicta  sentencia  confirmando  la  sentencia  del Tribunal  de  Apelaciones,  así  como  la  del  Tribunal  de Primera  Instancia.   Se  devuelve  el  caso  al  foro  primario para  que  se  diseñe  un  remedio  que  considere  adecuadamente los intereses de las partes concernidas.

    Así  lo  pronunció,  manda  el  Tribunal  y  certifica  la Secretaria  del  Tribunal  Supremo.   El  Juez  Asociado  Martínez Torres  emite  Opinión  de  conformidad  a  la  que  se  une  el  Juez Asociado  señor  Kolthoff  Caraballo.   El  Juez  Asociado  señor Rivera  Pérez  no  intervino.   La  Jueza  Asociada  señora  Pabón Charneco no interviene.


                    Aida Ileana Oquendo Graulau
                    Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ismael Herrero, Jr. y otros<br><br>Recurridos<br><br>v.<br><br>Hon. Gabriel Alcaraz Emmanuelli, Secretario de Transportación y Obras Públicas del Estado Libre Asociado<br><br>Peticionario<br><br>Hon. Carlos López Nieves, Procurador del Ciudadano<br><br>Interventor | CC-2008-425 |

Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la cual se une el Juez Asociado señor KOLTHOFF CARABALLO.

En San Juan, Puerto Rico, a 16 de junio de 2010.

Estoy de acuerdo con la determinación de la mayoría de este Tribunal que declara que la actuación de los secretarios del Departamento de Hacienda y del Departamento de Transportación y Obras Públicas bajo la gobernación del Hon. Aníbal Acevedo Vilá, fue *ultra vires* porque se impuso un arbitrio adicional a los "autos de lujo" sin contar con el aval de la Asamblea Legislativa de Puerto Rico.

Ante esa acción y conscientes de la precaria situación fiscal por la que atraviesa el gobierno, creo prudente diseñar un remedio que ponga en la balanza el derecho de los recurridos al reembolso de lo que el

Estado les cobró ilegalmente y la situación actual del tesoro público.

I

Los hechos no están en controversia. El entonces gobernador, Aníbal Acevedo Vilá, sometió a la Cámara de Representantes varias medidas contributivas para incrementar los recaudos del Gobierno. En lo pertinente, uno de los proyectos se convirtió en la Ley Núm. 42 de 1 de agosto de 2005. Esta ley aumentó de forma escalonada la cantidad a pagar por concepto de derechos anuales de los "automóviles de lujo", según definidos en la ley.

El Art. 6 de la Ley Núm. 42 dispuso como fecha de vigencia el "1ro de julio de 2005", pero "su efectividad estar[ía] sujeta a que se conviert[iera] en Ley la Resolución Conjunta Núm. 445 de la Cámara de Representantes sobre el Presupuesto General para el año fiscal 2005-2006". Esta disposición se convirtió en ley cuando el gobernador Acevedo Vilá firmó la medida aprobada por la Asamblea Legislativa.

Posteriormente, el gobernador Acevedo Vilá impartió un veto de bolsillo a la Resolución Conjunta Núm. 445 de la Cámara de Representantes. Sin embargo, por recomendación del entonces Secretario del Departamento de Justicia, Lcdo. Roberto Sánchez Ramos, el Estado decidió cobrar la contribución adicional dispuesta en la Ley Núm. 42. Para eso, el Estado se fundamentó en que la cláusula que condicionaba la efectividad de la Ley Núm. 42 era inconstitucional.

Varios contribuyentes afectados por la legislación presentaron varias demandas en las que alegaron que el Estado no podía cobrar la contribución adicional ya que la Resolución

Conjunta Núm. 445 no se convirtió en ley. Los demandantes solicitaron que se dictara sentencia declaratoria a esos efectos y exigieron la devolución de las sumas pagadas al amparo de la Ley Núm. 42. Estos casos fueron consolidados por el Tribunal de Primera Instancia y ese foro certificó el pleito como uno de clase.

El Estado solicitó entonces que se dictara sentencia sumaria a su favor. Adujo que la condición dispuesta en la Ley Núm. 42 era inconstitucional ya que contenía más de un asunto, al condicionar la efectividad del estatuto a la aprobación de otra ley. El Estado arguyó que, a su juicio, esta condición es inconstitucional, debe eliminarse y validar las demás disposiciones de la Ley Núm. 42.

Por su parte, los demandantes se opusieron y presentaron una solicitud de sentencia sumaria a su favor. Los demandantes alegaron que no se violó la norma de un solo asunto, pues se trataba de dos leyes independientes y que la Asamblea Legislativa tenía la potestad de condicionar de esa forma la efectividad de una ley. En la alternativa, los demandantes sostuvieron que si la condición era inconstitucional procedía decretar la invalidez de toda la Ley Núm. 42, pues no se incluyó una cláusula de separabilidad.

El 15 de marzo de 2007, el foro primario emitió sentencia en la que resolvió la solicitud de sentencia sumaria a favor de los demandantes. Ese tribunal concluyó que ambas medidas legislativas tenían una relación razonable entre sí por lo que se trataba de medidas germanas. En específico, el foro primario concluyó que "no se configura el *logrolling*; no están presente los *riders* que se buscaron evitar al redactar nuestra Constitución". Apéndice del recurso, pág. 772. Además, ese foro dictaminó que "condicionar la efectividad de esa medida de recaudo a la aprobación de la ley de

presupuesto general considerada dentro de un esquema presupuestario específico y bajo unas circunstancias particulares no viola norma constitucional alguna". Ibíd.

Al así concluir, el Tribunal de Primera Instancia decretó que la actuación del Estado de cobrar la contribución adicional a los "vehículos de lujo" era ilegal por no haberse cumplido la condición necesaria para su efectividad. En virtud de eso, ese foro ordenó la abstención del cobro de la contribución en exceso y la devolución de los dineros recibidos por tal concepto con excepción del 33%, ya que sería reservado para el pago de los honorarios de abogados.

Inconformes con esa determinación, el Estado acudió al Tribunal de Apelaciones, quien confirmó el dictamen recurrido. En su sentencia, ese foro validó la cuantía retenida por concepto de honorarios de abogados ya que esta suma sólo podía ser cuestionada por los miembros de la clase y había sido parte de una estipulación que el Estado no objetó. Por otro lado, el Tribunal de Apelaciones hizo un extenso análisis de la intención de la norma constitucional de un solo asunto y los conceptos de *rider*, *logrolling*, *tie-barring* y *germaneness*. Tras ese análisis, el foro apelativo intermedio concluyó que ambas medidas legislativas "est[aban] íntimamente relacionad[as], pues l[as] dos responden al esfuerzo de enfrentar el déficit estructural del Gobierno de Puerto Rico". Apéndice del recurso, pág. 44. Además, ese foro entendió que ambas medidas legislativas cumplían con el requisito de *germaneness* y que la Ley Núm. 42 no adolecía del vicio constitucional alegado por el Estado.

De esa decisión recurrió ante nos el Estado y sostuvo que el Tribunal de Apelaciones incidió al reconocer que la Asamblea Legislativa podía sujetar la efectividad de la Ley Núm. 42 a la

aprobación del presupuesto general para el año fiscal 2005-2006. Sus argumentos impugnan la condición establecida en la Ley Núm. 42 al amparo de la Constitución de Puerto Rico.

En síntesis, el Estado arguye que esta condición viola el Art. III, Sec. 17 de la Constitución. El Estado sostiene que la Ley Núm. 42 no es germana al presupuesto general. Este argumento lo fundamenta bajo la práctica inconstitucional del *logrolling*. Además, el Estado alega que esa actuación va en contra de la regla constitucional de que el presupuesto general solamente puede contener asignaciones y reglas para su desembolso, pues no puede incluirse en éste una medida sustantiva que impone arbitrios (Ley Núm. 42).

## II

El Art. III, Sec. 17 de la Constitución de Puerto Rico, dispone en lo pertinente que

> [n]o se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas...

Esta sección de la Constitución de Puerto Rico contiene varias normas que regulan el proceso legislativo. En lo pertinente, existe la exigencia de que una ley no puede tener más de un asunto, y que la ley de presupuesto sólo puede contener asignaciones y reglas para el desembolso de las mismas.

## A. Una ley, un asunto

La regla de una ley, un asunto, pretende impedir que se incluyan materias incongruentes y extrañas a los objetivos de las medidas presentadas. Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998). Esta exigencia no tiene contraparte en la Constitución de los Estados Unidos. J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, Ed. Temis S.A., 2009, pág. 244. Con esa disposición de la Constitución local se rechazó la práctica de algunas legislaturas de utilizar *riders* en la aprobación de medidas. Id. Sin embargo, nuestra jurisprudencia "ha adoptado una postura comprensiblemente laxa, para no maniatar al legislador". Id. En general, esa interpretación liberal a favor de la constitucionalidad se sigue en las cortes estatales de los Estados Unidos. N.J. Singer, J.D.S. Singer, Statutes and Statutory Construction, 7ma ed., West, 2009, Vol. 1A, Sec. 17:1, págs. 5-6.

Como bien señala la opinión mayoritaria y las decisiones de los foros inferiores, la regla de una ley, un asunto, persigue evitar la inclusión de materias extrañas que no tienen relación con la legislación propuesta. Con esa limitación se prohíbe la práctica de forzar la aprobación de disposiciones que de otra forma no se convertirían en ley y que no tienen relación con la medida aprobada.

En Pueblo v. Foote, Juez, 48 D.P.R. 492, (1935), citando a Commonwealth v. Barnett, 199 Pa. 161, 78 A. 976 (Pa. 1901), describimos la práctica que posteriormente fue vedada por la Constitución de Puerto Rico. En aquella ocasión manifestamos que

> [a]l redactar y aprobar un proyecto de ley, la legislatura tiene pleno dominio de todos y cada uno de los asuntos y disposiciones en él contenidos; y el gobernador, como una rama coordinada del poder legislativo, tiene, al desaprobarlo, por lo menos la misma amplitud.

> Mas uniendo un número de asuntos distintos en un proyecto, al gobernador se le obliga a aceptar algunas disposiciones que no puede aprobar o a vedar toda la ley, incluyendo otras que considera deseables o aún necesarias. Tales proyectos, conocidos popularmente con el mote de proyectos ómnibus, se convirtieron en un mal general no sólo por la confusión y distracción de la mente legislativa que los mismos conllevan al unir materias incongruentes, sino aún más por la facilidad que los mismos ofrecían a las combinaciones corruptas de las minorías con intereses encontrados para obligar a que se aprobaran proyectos con disposiciones que jamás se hubiesen adoptado, de haber sido redactados aisladamente. Tan común se hizo esta práctica que a la misma se le dio un nombre popular, generalmente conocido, o sea el de "pase de rolo" (*logrolling*). Entonces surgió la práctica aún más detestable de agregar a los mismos lo que se conoce con el nombre de "trillas" (*riders*) (es decir, una disposición legislativa nueva y ajena al proyecto) a los proyectos de presupuesto, obligando así al ejecutivo a aprobar legislación perjudicial o a hacer que la maquinaria gubernamental se detuviera por falta de fondos. Éstos fueron algunos de los males que los cambios más reciente en la Constitución trataron de remediar.

Pueblo v. Foote, Juez, *supra*, págs. 495-496.

La historia de algunos estados nos enseña que las legislaturas han puesto en vigor la práctica de incluir *riders* en una legislación para forzar la aprobación de medidas que no hubieran sido adoptadas por sí solas. N.E. Carter, Jubelier v. Rendell: Testing the Waters of the Governor´s Item-Veto Power Over Appropriations Bills, 17 WIDLJ 645, 648 (2008). A esa práctica se le denomina *logrolling* o "pase de rolo". Id.

El *logrolling* se define como la práctica legislativa de agrupar diversas disposiciones en una medida para que se apruebe en su totalidad incluyendo las disposiciones que no hubieran sido aprobadas si se propusieran en una medida separada. B.A. Garner, Black´s Law Dictionary, 9na ed., E.U., West, 2009, pág. 1028. Muchos estados han adoptado en sus constituciones la regla de un solo asunto para prohibir esa práctica. Ibíd. Por su parte, el

*rider* es la inclusión en una medida de una disposición que no tiene relación con el propósito principal de la medida. Id., pág. 1436. Por lo tanto, el *logrolling* es la finalidad vedada y el *rider* una de las maneras de lograrla.

Como mencionamos, el *logrolling* o pase de rolo es la práctica legislativa que agrupa varias piezas legislativas, sin relación entre sí, para que sean aprobadas aunque no todas cuentan con el apoyo mayoritario. J.A. Scudder, After Rants v. Vilsack: An Update on Item-Veto Law in Iowa and Elsewhere, 91 Iowa L. Rev. 373, 377 (2005). De esa forma, se aneja a una medida legislativa popular una provisión con apoyo minoritario. D. Buehler, Washington´s Title Match: The Single-Subject and Subject-in-Title Rules of Article II, Section 19 of Washington State Constitution, 81 Wash. L. Rev. 595 (2006).

Esta práctica va dirigida a forzar a otros legisladores o al gobernador a que se expresen a favor de la legislación que se incluye en forma de *rider*. Carter, supra, pág. 649. Para abolir esa práctica de *logrolling*, algunos estados en sus constituciones (y Puerto Rico), establecieron las limitaciones antes señaladas. Id. Esta prohibición proviene de Roma con la *Lex Caecilia Didia* en el año 98 antes de Cristo. Buehler, supra, pág. 603. Su propósito es combatir los males de la *lex satura* (una ley que tiene provisiones sin relación entre sí). Ibíd.

Esta disposición constitucional aplica cuando no existe una unidad razonable entre las provisiones de la medida legislativa o cuando las provisiones de la medida no se ciñen adecuadamente al título de la ley. Id., pág. 595. Es bajo esas circunstancias que se puede crear un voto mayoritario ficticio. Con el requisito constitucional de una ley, un asunto, se exige que haya unidad entre las disposiciones incluidas en la medida. Así, se evita que

se incluyan *riders* totalmente ajenos a la legislación para forzar indebidamente su aprobación.

Se denominan germanas las disposiciones que están razonablemente relacionadas entre sí. Id., pág. 600. Por eso, las cortes invalidan una ley sólo si las disposiciones y su título general no conforman una unidad razonable. Id. Se cumple con el requisito de un asunto cuando todas las materias tratadas en una legislación están relacionadas de manera razonable con un asunto o propósito general. Singer, Singer, op cit, Sec. 17:1, págs. 4-5.

Una ley no viola la regla de una ley, un asunto, cuando las disposiciones de la medida tienen relación directa o indirecta con el asunto general y guardan conexión mutua. Id., pág. 14. El cumplimiento de la exigencia de unidad razonable se puede evaluar bajo el criterio de germanidad (*germaneness*). Ese criterio evalúa si las provisiones de la medida son germanas al estar vinculadas al asunto expresado en su título. Id., pág. 22.

El requisito de germanidad exige que las provisiones legislativas tengan una relación estrecha, apropiada, relevante o pertinente con el asunto general. Id., págs. 22-26. La razón para ello, es que cuando las disposiciones de la ley y su título conforman una unidad no está presente el peligro de los *riders*, pues se trata de un objetivo central y no de materias extrañas entre sí. Precisamente, eso es lo que se intentó eliminar con el requisito de una ley, un asunto.

Por último, el *tie-barring* puede ser utilizado para lograr el *logrolling*. El *tie-barring* es la práctica legislativa de sujetar la efectividad de una ley a que otro proyecto se convierta en ley. The Honorable William Bryant, Jr., 1979-1980 Mich. Op. Atty Gen. 128. Bajo la regla de una ley, un asunto, no hay impedimento de emplear el mecanismo de *tie-barring* si hay directa y relativa

interdependencia entre ambos proyectos. Id. La práctica de *tie-barring* se viola solamente si la legislación tiene más de un asunto o si la ley no expresa suficientemente su propósito en su título. Ibíd.

Sin embargo, no se cuestiona el poder de la Asamblea Legislativa de sujetar la vigencia de una ley a la aprobación de otra. Id. Así pues, se ha reconocido que las legislaturas tienen la autoridad para sujetar la vigencia de una ley a un evento futuro y contingente. Id. Véanse, además, Mar v. Fisher, 187 P. 2d 966 (1947); Peck v. City of New Orleans, 5 So. 2d 508 (1941). Se puede condicionar la vigencia de una ley de forma contingente, pero la contingencia tiene que ser germana al asunto legislado. Singer, Singer, op cit., Sec. 20:24, pág. 156.

Aunque esta controversia no la hemos tenido antes ante nuestra consideración, ya otras cortes supremas de los estados, al amparo de disposiciones constitucionales similares a la de Puerto Rico, han atendido el asunto. Por ejemplo, el Tribunal Supremo de Florida ha validado el *tie-barring* cuando las leyes atadas están conectadas propiamente bajo un asunto, es decir, si hay directa y relativa interdependencia entre las mismas. Véanse, State v. Reado, 295 So.2d 440 (1974); In re Opinion to the Governor, 239 So.2d 1 (1970); Gaulden v. Kirk, 47 So.2d 567 (1950).

Ahora bien, al utilizar el *tie-barring* tiene que existir una relación razonable entre las leyes atadas. Véanse, In re Opinion to the Governor, supra; The Honorable William Bryant, Jr., supra. Si existe una relación razonable entre las leyes atadas no existe el mal que el *logrolling* intentó eliminar pues, aunque se consideren ambas leyes como una (para efectos de la norma de una ley, un asunto), todos los asuntos son germanos y no son extraños

entre sí. Esta práctica así utilizada no interfiere indebidamente con el poder constitucional de veto del gobernador. Ibíd.

## B. Ley de Presupuesto General

La Constitución de Puerto Rico tiene una disposición que regula específicamente la ley de presupuesto general. Según esa disposición "la ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas". Const P.R., Art. III, Sec. 17. Esta disposición es independiente y separada de la exigencia constitucional de una ley, un asunto. Esta cláusula prescribe un requisito de forma que dispone que el presupuesto general no puede contener una materia distinta a las asignaciones y reglas de desembolsos.

### III

Este recurso nos da la oportunidad de resolver si la condición para la efectividad de la Ley Núm. 42 constituyó o no una violación a la regla de una ley, un asunto. En específico, debemos resolver si condicionar la vigencia de la Ley Núm. 42 a la aprobación de la Resolución Conjunta Núm. 445 (Presupuesto para el año fiscal 2005-2006) constituyó una violación a la exigencia de una ley, un asunto. Además, debemos resolver si la condición mencionada incumplió con las exigencias constitucionales para aprobar una ley de presupuesto. Entiendo que la actuación legislativa no configuró la práctica de *logrolling* que la Constitución de Puerto Rico prohíbe y que no transgredió las normas constitucionales que regulan las leyes de presupuesto.

Bajo el fundamento de *tie-barring*, la Ley Núm. 42 pasó a ser parte de la Resolución Conjunta Núm. 445, ya que su efectividad dependía de esta última. La Ley Núm. 42 era una medida de recaudo relacionada directamente con la Resolución Conjunta Núm. 445, pues generaría ingresos para cuadrar el presupuesto del año fiscal

2005-2006. Debemos concluir que estas medidas están íntimamente relacionadas y no constituyen asuntos extraños o incongruentes entre sí. Esta actuación legislativa no configura el *logrolling* que la Constitución de Puerto Rico prohíbe. El mecanismo empleado no lesiona el poder de veto del gobernador.

No debemos confundir el análisis requerido por nuestra Constitución para la exigencia de una ley, un asunto, con la limitación de asuntos que puede incluir la ley de presupuesto general. No se puede hacer el mismo análisis al evaluar ambas disposiciones constitucionales.

La limitación de una ley, un asunto, requiere que las disposiciones de una ley sean germanas aunque se utilice el mecanismo de *tie-barring*. Bajo ese análisis, se analizan ambas leyes como si fuera una para ver si la condición fue razonable. Como vimos, la Ley Núm. 42 y la Resolución Conjunta Núm. 445 (presupuesto) tenían una relación directa y de interdependencia por lo que no se violó la regla de una ley, un asunto.

Sin embargo, este análisis no es relevante para determinar si la ley de presupuesto contenía un asunto vedado por la Constitución. Lo único que exige el Art. III, Sec. 17, es que la ley de presupuesto sólo contenga asignaciones y reglas para su desembolso. Esto nada tiene que ver con la relación que tiene la medida impugnada y el presupuesto. Por ejemplo, si la ley de presupuesto contuviera un asunto no relacionado con asignaciones y las reglas para su desembolso y además, tuviera una disposición que condicionara la efectividad de otra ley, sería inválida por lo primero, ya que contiene la prohibición de materias extrañas del Art. III, Sec. 17, aunque fuera válida la cláusula de efectividad condicionada. En cambio, sería válido que contuviera materias que de ordinario se considerarían como otro asunto siempre y cuando

éste fuera una asignación de fondos o las reglas para su desembolso.

De hecho, la propia Constitución exime la ley de presupuesto del requisito de una ley, un asunto, al expresar que "no se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto...". Constitución de Puerto Rico, Art. III, Sec. 17. Por eso, en la medida que la Resolución Conjunta Núm. 445 se limitó a asignaciones y reglas de desembolso, no se violentó la norma constitucional.

IV

Por los fundamentos que preceden, estoy conforme con la determinación de confirmar al Tribunal de Apelaciones, Región Judicial de San Juan. Sabida es la precaria situación fiscal por la que atraviesan las finanzas públicas. Domínguez Castro *et al.* v. E.L.A. I, Op. de 2 de febrero de 2010, 2010 T.S.P.R. 11, 2010 J.T.S. 20, 178 D.P.R. ___ (2010). Tal y como menciona la opinión del Tribunal, "un desembolso inmediato de los fondos concernidos podría erosionar aún más las ya menguadas arcas estatales". Opinión Mayoritaria, pág. 37.

Al respecto, estamos reconociéndole al Estado la oportunidad para que en un plazo razonable diseñe y someta para aprobación judicial un mecanismo que permita balancear los intereses de las partes. El estado puede, a modo de ejemplo, someter un plan que provea un descuento del pago a cada persona con derecho a ello. Esto permitiría que se acredite contra la cantidad de dinero a ser reembolsada, todo o parte de los derechos de inscripción anual de los vehículos de motor que esa persona posea. En la alternativa, podría dársele a cada reclamante, como parte de la compensación a que tenga derecho, un certificado con valor monetario (*voucher*)

para el pago de los derechos de inscripción anual de los vehículos de motor que ésta posea, si alguno. De esta manera se opondría la figura de la compensación contra la acreencia que tengan los miembros de la clase demandante que reclamen el reembolso. Corresponde al Estado, parte peticionaria, evaluar si es factible implementar este mecanismo o uno similar, e informárselo al tribunal.

Por la misma figura jurídica de la compensación, debe incluirse como parte del remedio la facultad del Estado para descontar del desembolso la cantidad que cada persona con derecho a recobro bajo la sentencia le adeude al Estado por concepto de impuestos, arbitrios, multas u otra acreencia similar. Se evita así que se desembolse dinero a una persona que tenga una deuda con el Estado. En esa instancia, el Estado acreditará la suma correspondiente a la deuda tributaria.

Para lograr lo anterior, este Tribunal devuelve el caso al Tribunal de Primera Instancia. Este último debería fijar un plazo razonable que permita que el Estado someta un plan para cumplir con lo anterior. De esa forma, se hace justicia a los miembros de la clase recurrida sin descalabrar indebidamente al tesoro público ni obviar el pago de otras deudas legítimas que puedan existir.


                          RAFAEL L. MARTÍNEZ TORRES
                               Juez Asociado